**Robert Madrid SALAZAR, Appellant,**

v.

**The STATE of Texas.**

No. 73451.

Court of Criminal Appeals of Texas.

Jan. 17, 2001.

Gary Taylor, Austin, for appellant.

Wade Jackson, Assistant District Atty., Lubbock, Matthew Paul, State's Atty., Austin, for the State.

*OPINION*

MEYERS, J., delivered the opinion of the Court in which KELLER, P.J., HOLLAND, JOHNSON, KEASLER, HERVEY and HOLCOMB, JJ., join.

Appellant was convicted in March 1999 of a capital murder committed in April 1997. Tex.Penal Code Ann. § 19.03(a)(8). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Articles 37.071 §§ 2(b) and 2(e), the trial judge sentenced appellant to death. TEX.CODE CRIM.PROC. Art. 37.071 § 2(g). Direct appeal to this Court is automatic. TEX.CODE CRIM.PROC. Art. 37.071 § 2(h). Appellant raises fourteen points of error.

■ In point of error one, appellant claims the evidence is legally insufficient to support the jury's affirmative answer to the "future dangerousness" special issue. We review the evidence in the light most favorable to the jury's verdict to determine whether any rational trier of fact could have concluded beyond a reasonable doubt that "there is a probability that [appellant] would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071 § 2(b)(1). *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Barnes v. State,* 876 S.W.2d 316, 322 (Tex.Crim. App.), *cert. denied,* 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994).

Appellant was charged with intentionally or knowingly causing the death of the two-year-old victim, who was the daughter of appellant's girlfriend. Viewed in a light most favorable to the verdict, the evidence shows that on April 23, 1997, appellant's girlfriend left the victim in appellant's care while she went to work. When appellant's girlfriend came home from work, she found the victim in bed and unconscious, breathing abnormally with blood in her mouth. Appellant was not there because he and a friend had gone to buy beer. Returning from the store, appellant and his friend saw an ambulance at his girlfriend's house. They did not stop, but

continued on to appellant's mother's house to drink the beer they had purchased.

When paramedics arrived at the scene, they noted that the back of the victim's head was caved in and felt like "Jello." There were also marks and bruises all over the victim's body. Suspecting child abuse, the paramedics contacted the police. The victim died later that evening.

Not long after discovering the victim, the victim's mother called appellant at his mother's house, and appellant told her not to tell the police that he had been watching the victim. Appellant later gave a written statement to the police. He admitted that he had been with the victim while his girlfriend was at work. He claimed that while giving the victim a shower he became angry with her because she would not stop crying and he had used the back of his hand to push her down in the bathtub, causing her to fall down and hit her head. Appellant also claimed he had abandoned the victim because he was scared.

The victim's autopsy revealed at least three life-threatening injuries and numerous non-life-threatening injuries. All of these injuries were "acute," meaning they had been inflicted within 48 hours of the victim's death. The pathologist testified that the victim's cause of death was multiple blunt force trauma and that the manner of death was ruled a homicide. The pathologist also testified that the injuries sustained by the victim were not consistent with appellant's version of the facts, but rather, indicated repeated blows of severe force.

According to the pathologist, the victim's life-threatening injuries were caused by hard blows to the victim's head, chest, and stomach. These injuries were "all high energy, high impact injuries." The blow to the head, consistent with having been slammed into something hard, fractured the victim's skull. A "major blow to the chest" bruised the victim's lungs, diaphragm and heart. The chest injury surpassed what the pathologist had seen previously in automobile accident injuries.

The heart was so severely damaged that had the victim lived, it would have ruptured, which would have been "incompatible with continued life." The blow to the stomach pushed the victim's abdomen against her backbone, crushing the tissues in between.

Injury to the victim's tongue and mouth was indicative of a blow to the mouth. The victim also suffered such severe shaking injuries that, had she lived, she would have been blind. There was bruising to the victim's neck and some of her ribs had been broken. Finally, injury to the victim's vagina was consistent with some type of sexual penetration.

During punishment, the prosecution presented evidence that appellant had committed a few minor thefts and had been involved in several assaultive offenses, including an assault on the mother of his two children. Soon after being placed in the county jail, appellant threatened to kidnap someone and escape. Appellant also threatened to commit suicide.

Appellant presented evidence that, if sentenced to life in prison, he would probably be placed in administrative segregation, which has a low incident rate because the inmates are closely monitored. He argued these circumstances lowered the risk that he would present a future danger. The prosecution presented rebuttal evidence that, although only 10–15% of the prison population is in administrative segregation, almost 40% of felony offenses committed within the prison are committed in administrative segregation. One of appellant's punishment witnesses also testified on cross-examination that, "left without any intervention" in the free world, appellant would commit criminal acts of violence in the future. This was based in part on appellant's lack of remorse for his actions as well as his tendency to minimize his involvement in the offense.

■ Appellant contends that based upon a consideration of all the evidence, particularly evidence that he presented

showing he was abused and neglected as a child, no rational juror could have affirmatively answered the "future dangerousness" special issue. A juror may give any weight or no weight to a particular piece of evidence in determining the special issues. *Soria v. State,* 933 S.W.2d 46, 65 (Tex. Crim.App.1996). The evidence viewed in a light favorable to the jury's determination was sufficient to support an affirmative answer to the "future dangerousness" issue.

The circumstances of this offense were particularly heinous. *See Barnes,* 876 S.W.2d at 322–23 (facts of offense can be sufficient to support "yes" answer to "future dangerousness" special issue). Appellant inflicted numerous life-threatening injuries on the two-year-old victim and then left her alone while he went to buy beer. Appellant beat the victim so badly that the back of her head felt like "Jello," and he so severely shook her that she would have been blind had she survived. Appellant had a history of committing assaultive offenses, and one of appellant's own witnesses admitted that he is dangerous to free society. In addition, testimony from the State's witnesses indicated that appellant could still be a future danger even if placed in administrative segregation. *See Collier v. State,* 959 S.W.2d 621, 623 (Tex.Crim.App.1997), *cert. denied,* 525 U.S. 929, 119 S.Ct. 335, 142 L.Ed.2d 276 (1998) (jury considers free and prison society in determining whether defendant is dangerous).

On this record, we cannot say the jury's affirmative answer to the "future dangerousness" special issue is irrational. **Point of error one is overruled.**

In point of error two, appellant argues the evidence is insufficient to support the jury's negative answer to the mitigating evidence special issue. *See* Tex.Code Crim. Proc. Art. 37.071, § 2(e)(1). Appellant claims that the mitigating evidence he presented "was such as to require the imposition of a life sentence rather than a death sentence" and that the only way to afford him "meaningful appellate review" is for this Court to review the sufficiency of the evidence to support the jury's negative answer to the mitigating evidence special issue.

■ We do not review the sufficiency of the evidence to support a jury's negative answer to the mitigating evidence special issue, and we have rejected the claim that this deprives a defendant of "meaningful appellate review." *See McGinn v. State,* 961 S.W.2d 161, 166 (Tex.Crim.App.1998), *cert. denied,* 528 U.S. 1163, 120 S.Ct. 1179, 145 L.Ed.2d 1086 (2000) (this Court does not conduct a sufficiency review of the mitigation special issue); *Green v. State,* 934 S.W.2d 92, 106–07 (Tex.Crim.App. 1996), *cert. denied,* 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997) (sufficiency review of mitigating evidence not required under Eighth and Fourteenth Amendments); *McFarland v. State,* 928 S.W.2d 482, 498–99 (Tex.Crim.App.1996), *cert. denied,* 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997) (constitutionality of Article 37.071 not contingent upon appellate review of mitigation issue). **Point of error two is overruled.**

■ In points of error three through five, appellant claims the trial court's failure to inform the jury that a life-sentenced appellant would be ineligible for parole for 40 years violated due process (point three) and equal protection (point four) guarantees under the Fourteenth Amendment and the Eighth Amendment's prohibition against cruel and unusual punishment (point five). We have rejected these claims. *See Green,* 934 S.W.2d at 105–06. **Points of error three through five are overruled.**

In points of error six through nine, appellant claims the trial court erred in denying him a new trial because the jury's extrinsic-to-the-record discussion of inaccurate parole information during punishment deliberations constituted jury misconduct under state law (point six) and deprived appellant of a fair and impartial

jury under the Sixth Amendment (point eight), of due process of law under the *Fourteenth Amendment (point seven)* and of his rights under Article I, § 10, of the Texas Constitution (point nine).

■ Appellant has briefed these points together, but his brief presents no authority in support of his argument that a jury's discussion of parole in cases like this prevents the jury from being impartial and therefore violates state and federal constitutional guarantees. Points of error seven through nine are, therefore, dismissed. *See* TEX.R.APP.PROC. 38.1(h); *cf. Emery v. State,* 881 S.W.2d 702, 707 n. 8 (Tex.Crim. App.1994), *cert denied,* 513 U.S. 1192, 115 S.Ct. 1257, 131 L.Ed.2d 137 (1995).

At the hearing on appellant's motion for a new trial, appellant presented the testimony of a number of jurors claiming that there was discussion of parole laws during the jury's deliberation. The State presented jurors' affidavits in an attempt to counter any claim of impropriety during deliberation. Both appellant and the State initially objected to the other parties' presentation of evidence of the jurors'

comments during deliberation as prohibited by Texas Rule of Evidence 606(b).[1] Eventually, both parties withdrew their 606(b) objections, leaving the testimony and affidavits of the jurors available for our consideration in determining whether reversible error occurred.

■ A jury's discussion of parole constitutes reversible error[2] when a defendant shows (1) a misstatement of the law; (2) asserted as a fact (3) by one professing to know the law (4) which is relied upon by other jurors (5) who for that reason changed their vote to a harsher punishment. *Sneed v. State,* 670 S.W.2d 262, 266 (Tex.Crim.App.1984).[3] The *Sneed* test was adopted by this Court as a means of examining a defendant's motion for new trial under Texas Code of Criminal Procedure Articles 40.03(7) and 40.03(8).[4] Article 40.03 was later repealed by the adoption of the Texas Rules of Appellate Procedure. However, *Sneed* is still good law because the current Texas Rules of Appellate Procedure 21.3(f) and (g) are nearly identical to Articles 40.03(7) and (8).[5] *See Buentello*

---

1. Texas Rule of Evidence 606(b) reads:
 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

2. Generally, upon a showing of error, a separate harm analysis is called for under Texas Rule of Appellate Procedure 44.2(b). However, harm is established by the fifth prong under *Sneed* by a showing that a juror changed their vote to a harsher punishment.

3. On its face, a Rule 606(b) objection would seem to preclude the use of the *Sneed* test in determining whether reversible jury miscon-

duct occurred. *See Hart v. State,* 15 S.W.3d 117, 122–124 (Tex.App.—Texarkana 2000). We, however, do not address that issue here, as any potential 606(b) objection was waived by both parties when they withdrew their initial objections.

4. Code of Criminal Procedure Articles 40.03(7) and (8) stated that:
 New trials, in cases of felony, shall be granted the defendant for the following causes, and for no other:
 (7) where the jury, after having retired to deliberate upon a case, has received other evidence; or ...
 (8) where, from the misconduct of the jury, the court is of the opinion that the defendant has not received a fair and impartial trial ...

5. Texas Rule of Appellate Procedure 21.3 states:
 The defendant must be granted a new trial for any of the following reasons:
 (f) when, after retiring to deliberate, the jury has received other evidence;
 (g) when the jury has engaged in such misconduct that the defendant did not receive a fair and impartial trial

*v. State,* 826 S.W.2d 610 (Tex.Crim.App. 1992). Therefore, we will use the *Sneed* factors to determine whether there was jury misconduct sufficient to warrant reversal of the judgment.

■■■ A trial court's ruling denying a defendant's motion for new trial is reviewed under an abuse of discretion standard. We do not substitute our judgment for that of the trial court, but simply determine whether the trial court's *Sneed* analysis was arbitrary or unreasonable. *See Sneed,* 670 S.W.2d at 267 and *Lewis v. State,* 911 S.W.2d 1, 7 (Tex.Crim.App. 1995). The trial court is the sole judge of the credibility of the testifying jurors. Where there is conflicting evidence on an issue of fact as to jury misconduct, the trial judge determines the issue and there is no abuse of discretion in overruling the motion for new trial. *See Sneed,* 670 S.W.2d at 266 and *Lewis,* 911 S.W.2d at 7 (quoting *Thomas v. State,* 699 S.W.2d 845, 854 (Tex.Crim.App.1985)).

■■■ At the motion for new trial hearing, both parties conceded that a life-sentenced defendant would not be eligible for parole for 40 years. Appellant presented testimony of jurors Voyles, Hamlin, Kelly and Ashley. Voyles testified that during punishment deliberations, it was revealed that Kelly was a police officer. Voyles stated that, after having disclosed his profession to the other jurors, Kelly professed to know the law and asserted as a fact that a life-sentenced appellant would be eligible for parole in 20 years. Voyles testified that he relied on Kelly's statements as to the law pertaining to parole, but that this did not affect his vote. Hamlin testified that he vaguely remembered a juror mentioning that a life-sentenced appellant would be eligible for parole in 20 or 25 years but that this did not affect his vote.

On direct examination, Ashley testified that Kelly professed to know the law in the area of parole because of his experience as a police officer and asserted as a fact that a life-sentenced appellant could be eligible

for parole in 20 years. Ashley stated that she relied on these comments in making her decision on sentencing. She testified that she was "holding out for life" up "into the fifth hour" until she heard Kelly's statements about parole.

Q. How did that reliance affect your vote?

A. Well, up into the fifth hour, I had decided life, but, as we were deliberating, and [Kelly] made the statements [about parole] that he did, it helped cause me to change my mind from life to death.

Q. So were you, I guess for lack of a better word, holding out for life up until you heard that?

A. Uh-huh, yes.

During cross-examination, the State questioned Ashley about a statement she made to reporters indicating that she voted for the death penalty because she thought appellant would be released in 30 to 40 years if he received a life sentence. She testified that when she voted for the death penalty in appellant's case, she believed that if appellant received a life sentence, he would be released anywhere from 20 to 40 years later. She also testified that her vote for the death penalty was prompted by testimony during trial that there was no guarantee appellant would be placed in administrative segregation, meaning that he might continue to be a danger to the general prison population if given a life sentence. The State finished Ashley's cross-examination by asking:

Q. It was a combination of all of those things that you put in your affidavit; the thought that in 30 to 40 years, he was going to get out, and he would be a more dangerous criminal, ad[ministrative] seg[regation], and parole. All of those things—

A. Yes.

Q. —influenced your verdict?

A. Yes.

Kelly also testified at the motion for new trial hearing and provided a different ver-

sion of events than those provided by Ashley. On direct examination, Kelly indicated that he gave an opinion on the parole laws based upon his experience. He testified that, during deliberations, he mentioned to the other jurors that "life doesn't mean life, that [appellant] can get out on parole," but he could not recall how many years he said a life-sentenced defendant would serve before becoming eligible for parole. On cross-examination, Kelly testified that he did not hold himself out as "some kind of legal expert in the area of parole" or as having "some kind of special expertise in parole law."

The prosecution presented sworn affidavits from four other jurors. Juror Holdridge's affidavit states that Kelly never "held himself out as an expert in the area of Parole laws." Holdridge's affidavit states that any consideration of parole laws by the jurors focused on possibilities of how many years appellant would serve before being released, but that no actual number of years was ever asserted by any of the jurors.

Juror Stanford's affidavit also states that Kelly "never held himself out as someone who knew" the parole law. The affidavit asserts that any discussion of parole centered around the fact that a life sentence left open the possibility that appellant would be released at some time, regardless of exactly how many years it would take. Stanford's affidavit admits that Kelly participated in these discussions of parole, but that he never stated his opinions as fact.

The affidavits of Tinney and Perez are consistent with the two affidavits described above. Tinney's affidavit states that Kelly "never said anything that because he was a police officer he knew what the law was or anything of that nature." Perez' affidavit states that Kelly "never held himself out as an expert" in the area of parole, that Kelly "never made any comments like this is the law or because I'm a police officer I know this is the law," and that Kelly never held himself out as "having specific knowledge or fact knowledge" on the issue of parole law.

Based on the jurors' testimony and the affidavits submitted by the State, the trial court did not abuse its discretion in denying appellant's motion for a new trial. There are a number of discrepancies between the various jurors' testimony and affidavits as to what went on during deliberations. There is no consensus regarding whether Kelly actually held himself out as an expert on parole law and represented to the other jurors, as a fact, that appellant would be released on parole in 20 years if he were to receive a life sentence. A number of the affidavits state that Kelly only provided an opinion on the general issue of parole during discussion with the other jurors. This is "conflicting evidence on an issue of fact," and any decision as to credibility of the jurors' testimony is left to the trial judge. *Id.*

In addition to disagreement between the jurors as to what went on during deliberations, Ashley's own testimony is inconsistent concerning how her vote was affected by Kelly's discussion of parole laws. On direct examination, she stated that she voted for the death penalty over life imprisonment because of Kelly's statements that appellant could be released on parole in 20 years, but on cross examination, she admitted that a number of factors contributed to her decision, including testimony concerning administrative segregation and the belief that the defendant might be released in 20 to 40 years. This is conflicting evidence on an issue of fact, which, again, is decided by the trial judge.

Because the evidence was conflicting, we cannot say the trial court abused its discretion in concluding that the *Sneed* factors were not met and denying appellant's motion for new trial. **Point of error six is overruled.**

 In point of error ten, appellant claims the trial court abused its discretion in denying appellant's motion to change venue. To prevail on a motion to change

venue, a defendant must show an inability to obtain an impartial jury or a fair trial in the place of venue. *See Willingham v. State,* 897 S.W.2d 351, 357 (Tex.Crim. App.), *cert. denied,* 516 U.S. 946, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995). To justify a change of venue based on media attention, a defendant must show that the publicity about the case was pervasive, prejudicial and inflammatory. *Bell v. State,* 938 S.W.2d 35 (Tex.Crim.App.1996), *cert. denied,* 522 U.S. 827, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997). We review a trial court's ruling on a motion for change of venue under an abuse of discretion standard. *Willingham,* 897 S.W.2d at 357.

Appellant moved to change venue based on recent and significant amounts of media publicity about his and several similar cases involving the deaths of children. A criminal defense lawyer testified for appellant that publicity regarding similar cases in the area had the effect of creating greater prejudice, bringing "some aforethought to people" and making it "very hard" to find a fair and impartial jury. Appellant called a number of other witnesses who testified as to the amount of media coverage regarding appellant's and similar cases. These witnesses also gave testimony on circulation estimates for the newspapers and audience numbers for the television stations, in an attempt to exhibit the number of potential jurors exposed to these stories. The trial court admitted several newspaper stories and transcripts of television news coverage concerning appellant's case and the similar cases underway at the time.

The State countered with several residents of the county who testified that appellant could receive a fair trial in the place of venue. In addition, through cross examination of a number of appellant's witnesses, the State elicited testimony that very few of the newspaper or television stories mentioned appellant's case specifically and that the media coverage was informative, not prejudicial.

Given that the evidence regarding the effect of the publicity was conflicting and it was not clear that the media coverage was pervasive, prejudicial and inflammatory, as is required under *Bell,* we cannot say that the trial court abused its discretion in denying appellant's motion to change venue. **Point of error ten is overruled.**

In point of error eleven, appellant complains of the admission into evidence at guilt of several photographic slides taken during the victim's autopsy. Appellant complains of the admission into evidence of State's exhibits 120, 134, 135, 136 and 137.[6]

The exhibits at issue are photographic slides of some of the victim's internal organs after their removal from the victim's body. The State claims the exhibits were offered for the purpose of showing the extent of the victim's injuries and how those injuries contributed to the victim's death. In his statement to police, appellant claimed that although he had become angry with the victim while babysitting her on the day of her death, he had only pushed her down in the bathtub once. During closing arguments, appellant argued that the State had failed to prove appellant intended to kill the victim. The State argued at trial that the massive amount of injury to the victim's internal organs was not consistent with being pushed down in the bathtub, but instead

---

**6.** Although appellant lists these numbered exhibits as the basis for point of error eleven, appellant also states in his brief that he objected to "each photo of a body part which was removed from the body" and that all of them were improperly admitted. It is unclear whether appellant is attempting to include in his claim State's exhibit 129, which was a slide of the victim's dissected eye globes. However, since appellant failed to specify exhibit 129 in his brief as one of the slides admitted in error, we will not address that particular slide in our analysis. Appellant also lists State's exhibit 138 as one of the slides erroneously admitted. The record reflects, however, that appellant did not object to the admission of exhibit 138, so he presents nothing for review with respect to this exhibit. *See* Tex.R.App.Proc. 33.1(a).

indicated that the victim had been severely beaten and shaken, thereby proving appellant's intent to kill.

State's exhibit 120 "is a slide of the brain that has been removed from the cranial cavity." The exhibit shows "an area of bruising on the under-surface of the temporal lobe" and "on the under-surface of the frontal lobe" characteristic of a contrecoup injury, an injury "typically associated with the head [being] in motion and contacting a hard surface." According to the pathologist, no other exhibit showed "this particular point" or injury. The pathologist also testified that, although he could use a diagram to explain these injuries to the jury, the picture of the actual injury to the organ as shown in State's exhibit 120 was "worth a great deal in terms of trying to convey what ha[d] happened."

State's exhibit 134 is a slide of one of the victim's lungs showing hemorrhaging in the lungs and bruises on the back surface of the lungs and on the diaphragm. The pathologist testified that he "really [did not] think" there was any other way to fully demonstrate these injuries to the jury.

State's exhibit 135 is a slide of the victim's heart showing "a pattern of massive hemorrhage into the right atrium area." State's exhibit 136 is a slide of the victim's "opened and dissected" heart showing a "massive pattern of bruising that is present in the atrial chamber of the heart." These exhibits together showed "the full extent of the [heart] injury" which, according to the pathologist, could not be fully described without these exhibits.

State's exhibit 137 is a slide of the attachment to the small bowel, which is part of the abdomen, showing a "pattern of massive bruising and injury." The pathologist testified that it would have been diffi-

cult to demonstrate this injury without the slide.

■ Appellant claims that these exhibits are more prejudicial than probative because they were "greater than life size color pictures of [a young child's] mutilated body parts" projected for the jury's observation. Admission of such potentially prejudicial evidence is governed by Texas Rule of Evidence 403.[7] When determining whether these exhibits were properly admitted, the question is not whether the exhibits are *more* prejudicial than probative, but rather, whether the probative value of the slides is *substantially outweighed* by the danger of unfair prejudice. We review a trial judge's Rule 403 decision for an abuse of discretion, meaning it will be reversed only if the decision is outside the zone of reasonable disagreement. *Narvaiz v. State*, 840 S.W.2d 415 (Tex.Crim. App.1992).

■ "Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself." *Rojas v. State*, 986 S.W.2d 241, 249 (Tex.Crim.App.1998). *See also Santellan v. State*, 939 S.W.2d 155 (Tex.Crim. App.1997), *Burdine v. State*, 719 S.W.2d 309 (Tex.Crim.App.1986). In *Rojas* and *Santellan*, the main concern was that the jury might attribute certain injuries caused by the autopsy to the appellant, which would be unfairly prejudicial to the appellant's case. *See Rojas*, 986 S.W.2d at 249 (autopsy photographs admissible because the depicted gun shot wounds and trauma to the pelvic area were a result of appellant's actions, not the performance of the autopsy); *Santellan*, 939 S.W.2d at 173 (a change rendered as part of the autopsy process which is of minor significance does not prevent the admission of the picture when the disturbing nature of the photograph is due primarily to the injuries caused by appellant). When the photo-

---

7. Texas Rule of Evidence 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair preju-

dice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

graphs at issue are depictions of internal organs which have been removed, so as to portray the extent of the injury to the organ itself, there is no depiction of "mutilation of the victim" as that phrase was used in *Rojas.* There is no danger that the jury would attribute the removal of the organs to the defendant. Therefore, the fact that the organs were removed from the victim's body in the photos shown to the jury is not, by itself, determinative of whether the exhibits should have been admitted.

We have previously said that, when performing a Rule 403 analysis, the trial court must consider "the host of factors affecting probativeness ... and balance those factors against the tendency, if any, that the photographs have to encourage resolution of material issues on an inappropriate emotional basis." *Ladd v. State,* 3 S.W.3d 547, 568 (Tex.Crim.App.1999). When determining the proclivity of pictures to spur emotional decision-making, the court should examine the "number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, [and] whether they are close-up." *Long v. State,* 823 S.W.2d 259, 272 (Tex.Crim.App.1991). Additionally, relevant criteria in determining whether the prejudicial effect of a piece of evidence substantially outweighs the probative value include the fact "that the ultimate issue was not seriously contested by the opponent; that the State had other convincing evidence to establish the ultimate issue to which the [evidence] was relevant; that the probative value of the ... evidence was not, either alone or in combination with other evidence particularly compelling; that the [evidence] was of such a nature that a jury instruction to disregard it for any but its proffered purpose would not likely be efficacious." *Reese v. State,* 33 S.W.3d 238, 241 (Tex.Crim.App. 2000)

(citing *Montgomery v. State,* 810 S.W.2d 372, 392–93 (Tex.Crim.App.1990)). The trial court should also, if applicable, consider "the fact that the body has been altered since the crime in some way (e.g., by autopsy) that might enhance its gruesomeness to the defendant's detriment." *Narvaiz,* 840 S.W.2d at 429.

The photographs admitted in this case were highly probative. As was stated earlier, appellant claimed that any injury caused by his actions was the result of his pushing the victim down, once, in the bathtub. The slides were used to show that internal injuries reflected a very different situation, one in which the victim was beaten repeatedly, with extreme force. The State relied upon evidence of the victim's severe internal injuries to prove that appellant acted with the intent to kill the victim. In addition, the State's pathologist testified that the slides were necessary to adequately portray the extent of the victim's injuries to the jury. *Cf. Fuller v. State,* 829 S.W.2d 191 (Tex.Crim.App.1992) (when ruling on a Rule 403 issue, the degree to which the proponent of the evidence will be disadvantaged without the evidence at issue is a factor affecting probativeness).

We now consider the tendency these slides had to "encourage resolution of material issues on an inappropriate emotional basis." *Ladd,* 3 S.W.3d at 568. There are four slides in question, all in color, all close-ups of organs, and all projected for viewing by the jury.[8] The slides are graphic, in that they are pictures of internal organs which have been removed from the victim's body. The victim's body does not appear in any of the shots. All of the organs have been removed and placed on a separate tray for the taking of the photograph. This tends to lessen the gruesome nature of the photographs.[9] Although the

**8.** The record fails to indicate details on the projection of the images, such as their size, whether they were projected onto a screen or the wall of the courtroom, the amount of time

each image was displayed for the jury's observation, etc.

**9.** Other slides admitted without objection show the victim after the coroner made a Y-

body of the victim was obviously altered to allow the coroner to remove the organs, there is no mutilation to the body shown in the slides at issue. The only damage to the organs pictured is damage done by appellant. While it is true that the slides might encourage the jurors to consider the fact that the victim's body had to endure an autopsy, that much was already clear based on other slides admitted without objection by appellant.

Given the circumstances of this particular case, we cannot say the trial court abused its discretion to decide that the probative value of the photographs, which was particularly weighty here, was not substantially outweighed by the danger of unfair prejudice.[10] **Point of error eleven is overruled.**

■ In point of error twelve, appellant claims that the trial court erroneously granted the prosecution's challenge for cause to veniremember Robertson. The trial court granted the State's challenge for cause because Robertson had not been candid about her prior criminal history. Appellant claims this was erroneous because Article 35.16 does not contain grounds for excusing a veniremember who "is not truthful, not candid, or not frank." Appellant also claims that Robertson could not have been excused as "incapable or unfit" or "disabled", as prior cases have construed these terms.

Any error in excusing Robertson was harmless because appellant has not shown that this denied him a fair and impartial jury. *See Ladd v. State*, 3 S.W.3d 547, 562 (Tex.Crim.App.1999); *Brooks v. State*, 990 S.W.2d 278, 289 (Tex.Crim.App.), *cert. denied*, 528 U.S. 956, 120 S.Ct. 384, 145 L.Ed.2d 300 (1999); *Jones v. State*, 982 S.W.2d 386, 391–94 (Tex.Crim.App.1998),

*cert. denied*, 528 U.S. 985, 120 S.Ct. 444, 145 L.Ed.2d 362 (1999). **Point of error twelve is overruled.**

In points of error thirteen and fourteen, appellant claims the trial court erroneously admitted hearsay testimony regarding an extraneous offense (point thirteen) and that this violated appellant's confrontation rights under the Sixth and Fourteenth Amendments (point fourteen). The State argues admission of this testimony did not violate appellant's confrontation rights because it was admissible as an excited utterance, a firmly rooted hearsay exception.

Sylvia Aguirre, a neighbor of the victim's babysitter, testified that in January 1997 when she was helping the victim take her coat off, the victim cried out in pain. When Aguirre removed the victim's coat, she noticed an injury to the victim's shoulder. Aguirre asked the victim who had injured her and the victim replied "Robert did it." The injury turned out to be a fractured collarbone and a dislocated shoulder.

■ The trial court admitted Aguirre's testimony as an excited utterance over appellant's hearsay and violation of confrontation rights objections. Appellant claims the trial court should not have admitted Aguirre's testimony because circumstances surrounding the statement prevent its classification as an excited utterance. Appellant claims there was no evidence to demonstrate when the injury occurred, the victim's statement was a response to a question and not spontaneous, and the victim was not "still in the grips of the event which caused the injury." We review the trial court's ruling admitting Aguirre's testimony under an abuse of discretion standard meaning that we will uphold the trial court's decision if it is within "the zone of

---

shaped incision and pulled back the skin to display the neck muscle. These photographs are more gruesome and inflammatory in nature because they show the victim's face and extensive mutilation to the body due to the autopsy process, as described in *Rojas, supra* and *Santellan, supra.*

**10.** We emphasize that while the trial court did not abuse its discretion under the facts of this particular case, this is not an indication that it is, in general, acceptable to admit photographs of organs removed from a victim during the autopsy.

reasonable disagreement." *Cf. Montgomery v. State*, 810 S.W.2d 372, 390–91 (Tex. Crim.App.1990) (op. on reh'g).

 The excited utterance hearsay exception permits admission of a hearsay "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tex.R.Evid. 803(2). It is not dispositive that the statement is an answer to a question or that it was separated by a period of time from the startling event; these are simply factors to consider in determining whether the statement is admissible under the excited utterance hearsay exception. *See Lawton v. State*, 913 S.W.2d 542, 553 (Tex.Crim.App. 1995); *Penry v. State*, 903 S.W.2d 715, 750–51 (Tex.Crim.App.), *cert. denied*, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995); *McFarland v. State*, 845 S.W.2d 824, 846 (Tex.Crim.App.1992), *cert. denied*, 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993). The critical determination is "whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event" or condition at the time of the statement. *McFarland*, 845 S.W.2d at 846.

As appellant asserts, there is no indication as to when the victim sustained the injury attributed to appellant.[11] Therefore, the amount of time between the injury and the statement cannot be considered in determining whether the statement was an excited utterance.

In examining the trial court's decision, we look to the testimony of Herlinda Castro and Sylvia Aguirre to determine the victim's physical and emotional condition at the time of the statement. Castro's testimony before the jury indicated that when the victim arrived at her house, she did not want her coat removed and that,

when Castro finally attempted to remove the victim's coat, she began yelling that she was in pain and started crying. Aguirre testified that, although the victim was not "hysterical", she was crying nearly the entire time, crying which worsened when the two women attempted to move her arm.

The declarant was a two-year-old child suffering from a fractured collarbone and dislocated shoulder. The testimony regarding her behavior indicates that she was upset and in pain at the time of the statement. Based on these facts, we cannot say that the trial court's admission of Aguirre's testimony under the excited utterance hearsay exception was outside "the zone of reasonable disagreement." *See Wood v. State*, 18 S.W.3d 642, 652 (Tex. Crim.App.2000) (hearsay statement was properly excluded because it was separated from the event it concerned by ten to twelve hours and declarant's behavior in the interim did not indicate any excitement or nervousness on declarant's part); *Lawton*, 913 S.W.2d at 553 (hearsay statement by an eyewitness was properly admitted as an excited utterance, even though one hour separated the event from the statement, because of the magnitude of the crime witnessed and the testimony of an officer that declarant was excited and upset when he made the statement); *McFarland*, 845 S.W.2d at 846 (victim's statement was properly admitted as an excited utterance because she was still under the physical and emotional stress of having been stabbed 43 times when discovered by the police). The trial court could reasonably have found that the victim's statement to Aguirre "relat[ed] to a startling event or condition," that being the "startling event" of the victim sustaining the injury or the "startling condition" of the pain the victim suffered when her coat was removed, and

---

**11.** There is evidence in the record that, when the victim was taken to the emergency room for treatment of the shoulder injury, the victim's mother told the treating physician that the injury was a result of a fall on the ice the day before. However, there was no testimony during appellant's trial confirming that this fall was the actual cause of the victim's fractured collarbone and dislocated shoulder. We, therefore, will not assume that the information given to the emergency room doctor provides the correct date of injury.

that the victim was still under the physical and emotional "stress of the excitement caused by the event or condition" when she made the statement to Aguirre. *See Penry,* 903 S.W.2d at 751.

There was no violation of appellant's Sixth Amendment right to confrontation. The victim was unavailable and the excited utterance hearsay exception is "firmly rooted," providing adequate indicia of reliability for the statement. *See Penry,* 903 S.W.2d at 751. **Points or error thirteen and fourteen are overruled.**

The judgment of the trial court is affirmed.

PRICE, J., concurs in points of error 6–9 and otherwise joins. WOMACK, J., concurs in point of error 2 and otherwise joins.