

## NUMBER 13-09-00233-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

**THOMAS McQUARRIE,**                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                        **Appellee.**

### On appeal from the 2nd 25th District Court
### of Gonzales County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides
Memorandum Opinion by Justice Benavides**

Appellant, Thomas McQuarrie, was convicted by a jury of sexual assault against L.C., an adult. *See* TEX. PENAL CODE ANN. § 22.011 (Vernon 2003). The court sentenced McQuarrie to four years' confinement in the Institutional Division of the Texas Department of Criminal Justice. By five issues, which we renumber as three,

McQuarrie contends that: (1) the evidence was insufficient to establish the non-consensual element of sexual assault; (2) the trial court erred in excluding the affidavits and testimony of two jurors at the hearing on his motion for new trial; and (3) he was deprived of his right to a fair trial under both the United States and the Texas constitutions. We affirm.

## I. BACKGROUND

McQuarrie and L.C. knew each other for a number of years and became related by marriage when McQuarrie's brother married L.C.'s mother. They considered each other to be "buddies," and they "hung out" regularly.

Both McQuarrie and L.C. testified that L.C. was homosexual, not bisexual. At the time of trial, L.C. was twenty-one years old and testified that she had been dating the same woman, K.G., for four years. L.C. testified that she had not had a romantic interest in a male in ten years; she had not had a relationship with a male since she was fourteen or fifteen years old; she did not have a romantic interest in McQuarrie, nor did she flirt with him; and before the sexual intercourse with McQuarrie, she had never had sexual intercourse with a man. L.C. testified that the thought of sexual intercourse with a man was "disgusting; nasty; just uncomfortable."

In April 2006, McQuarrie and L.C. met at the home of Michelle Vega, L.C.'s aunt, along with several other friends and family members. The testimony indicated that the group was barbecuing and drinking alcohol. McQuarrie invited L.C. to his parents' former house where he and his friend, Troy Parea, were staying while in town. McQuarrie testified that he, Troy, and L.C. returned to his house at about 10 p.m. where they all played drinking games, drank shots of liquor, smoked marihuana, and used

2

cocaine.   L.C. testified that Troy and McQuarrie were drinking and using cocaine, but that when offered, she refused.   In her statement to the police, however, L.C. admitted that she drank "a little bit of beer" and did not mention any cocaine use by the others. She testified that she shared one marihuana joint with McQuarrie, Troy, and her friend Joseph—who was at McQuarrie's house for the first couple hours of the night. McQuarrie and Troy both testified that no one was at the house except the two of them and L.C.

L.C. testified that at around 12:30 or 1 o'clock in the morning, she asked McQuarrie for a drink, and he brought her a glass of water.   She testified that after she drank the water, she did not feel well and that her "stomach just felt real light."   She sat down on McQuarrie's blow up mattress—which was the only furniture in the house—and the others moved around her and went outside to smoke while she stayed sitting down. Around 2 a.m., L.C. decided she would spend the night.   According to K.G., L.C. telephoned her briefly to tell her that she was going to stay at McQuarrie's house because she did not feel well.   L.C. testified that they brought a second mattress into the living room, but it was later moved back to another room because L.C. did not feel comfortable sleeping in the same room with Troy because she did not know him.   In her statement to police, L.C. noted the moving of mattresses around as causing her unease, but she did not mention that she did not feel well at that time.

McQuarrie testified that L.C. showered, redressed, and returned to the living room where he and Troy were, and that when Troy was ready to go to bed, they moved one of the mattresses into the bedroom for him and that McQuarrie and L.C. shared the mattress in the living room.   Troy testified that after she showered, L.C. and McQuarrie

3

were flirting and began a "hands-on thing," so he went to bed in order to leave them alone. When asked if he knew L.C. was homosexual, Troy noted that "once I saw her with [McQuarrie], I thought she was straight."

L.C. testified that she had not taken a shower that night, and that after she laid down, McQuarrie did not join her in the bed until after she was asleep. L.C. denied: (1) giving McQuarrie permission to have sex with her; (2) wanting to experiment; (3) getting "touchy-feely" with McQuarrie; (4) flirting; (5) "fooling around" whatsoever; (6) kissing him; and (7) any memory of McQuarrie kissing her or taking off his clothes.

McQuarrie testified that after they laid down, they shut their eyes and he "felt a hand go to [his] stomach and kind of do this (indicating) a little bit, and one thing lead to another." He testified that he kissed L.C. once or twice on the mouth, and that after ten minutes of rubbing each other with their clothes on, he removed his shorts and retrieved a condom out of his bag. McQuarrie testified that he did not take L.C.'s clothes off and that no words were exchanged but that she was looking directly at him during the encounter. He testified that L.C. never said "no" or "stop" and did not try to push him away. He was sure she knew what was happening because they had "partied like that many, many times: the cocaine, the weed, and the alcohol." McQuarrie specifically denied giving L.C. any date rape drugs.

L.C. testified that when she woke up in the morning, she "just didn't feel . . . right" and that she "felt dirty." She testified that McQuarrie was on the other side of the air-mattress, appeared to be awake and watched her gather her things, but she simply left without speaking to him. In her statement to police, however, L.C. said that she awoke to McQuarrie standing at the end of the bed, but she pretended to be asleep

4

because she "didn't know if . . . he was going to hurt [her] again," and that when he got back into bed, she waited for him to go back to sleep before she got up and left. On cross-examination, L.C. testified that this was the "first time" she woke up, and that McQuarrie was in bed when she left. McQuarrie testified that when L.C. got up, she told him she was going to her aunt's house, and he acknowledged her.

L.C. testified that after leaving McQuarrie's house, she went to her aunt's house and took a shower. She testified that she "really didn't know what happened," but that she "knew something was wrong." L.C. called K.G. and told her that she did not know what happened; K.G. told L.C. that she needed to tell somebody. K.G. testified that L.C. was "real quiet and upset," and that she was crying. K.G. testified that if L.C. had consented to having sex with McQuarrie, she would have been mad.

Following discussions with friends and family, Lieutenant West of the Gonzales Police Department spoke with L.C. L.C. told Lieutenant West that when she woke up, "her shorts and her boxer shorts were . . . turned different than what they were when she went to sleep." Lieutenant West collected the clothes L.C. had been wearing as evidence and noted that L.C. had no bleeding or discomfort to her vaginal area. Lieutenant West testified that L.C. would not make eye contact and she spoke really softly, which she testified was consistent with sexual-assault-victim behavior. On cross-examination, Lieutenant West testified that L.C. was not even sure she had had sex with McQuarrie.

The following day, Easter Sunday, McQuarrie arrived at L.C.'s mother's house for a family gathering. L.C.'s mother testified that she told McQuarrie to leave, and that he claimed not to have any idea what was going on and that "nothing happened."

5

Clay Fetters, a patrol officer with the Gonzales Police Department, testified that he originally thought it strange that a female who only drank a little beer and smoked a joint would stay asleep during sexual intercourse. He testified that is was possible that L.C. had been drugged, and that drugs go out of the blood "pretty much immediately"—making them difficult to detect.

Nearly a year after the event, the police department asked McQuarrie to come in for questioning, to which he agreed and voluntarily provided DNA samples. McQuarrie admitted to having consensual sex with L.C. and that they had consumed alcohol and marihuana on the night in question. McQuarrie's DNA was matched to semen found on L.C.'s clothes that were taken by the police.

Laura Kinnison, a crisis intervention counselor and victim's advocate, testified that she counseled and observed L.C. five or six times between December 2006 and April 2007. She testified that L.C. reported feelings of anger, feeling changed, and experiencing intrusive thoughts and nightmares—all of which were consistent with other "sexual assault survivors" she had counseled. Kinnison acknowledged that she was not a mental health expert, and further noted that it is possible that these issues could have stemmed from the simple fact that L.C. is homosexual or from a consensual encounter by a homosexual woman with a person of the opposite sex.

During the jury's deliberations, the jurors sent a note to the judge at the end of the first day indicating that they were split nine to three in favor of a guilty verdict. The jury returned the next day and deliberated for an additional hour before finding McQuarrie guilty of sexual assault. At the hearing on his motion for new trial, McQuarrie offered into evidence the affidavits of two of the jurors from the trial who affirmed that a third juror

6

had researched the effects of date rape drugs when the jury was released after the first day of deliberations and relayed that information to the other jurors. They additionally noted that they had previously been undecided on guilt and that the information provided by the juror caused them to vote guilty. The trial court found that the affidavits did not show sufficient "outside influence" and, therefore, refused to consider the affidavits and overruled the motion for new trial. This appeal ensued.

## II. DISCUSSION

### A. Sufficiency of the Evidence

By his first and second issues, McQuarrie contends that the evidence at his trial was legally and factually insufficient to establish the non-consensual element of sexual assault. The Texas Court of Criminal Appeals has held that our only sufficiency review should be under "a rigorous and proper application" of the *Jackson* standard of review, and therefore, we apply only that standard as argued in McQuarrie's legal sufficiency argument. *See Brooks v. State*, 323 S.W.3d 893, 906 (Tex. Crim. App. 2010). Under this standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks*, 323 S.W.3d at 902 n.19. "[T]he fact-finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis in original); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979) (The jury, in all cases, is the exclusive judge of facts proved, and the weight to be given to the testimony . . . ."); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex.

7

Crim. App. 2000) ("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence.").

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 238-40 (Tex. Crim. App. 1997); *see also Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). Under a hypothetically correct jury charge, the State was required to prove beyond a reasonable doubt that McQuarrie: (1) intentionally or knowingly; (2) caused the penetration of the sexual organ of L.C. by any means; (3) without her consent. *See* TEX. PENAL CODE ANN. § 21.011(a)(1)(A). The statute dictates that the State can show a lack of consent by showing, among other possibilities, that: (1) "the other person has not consented and the actor knows the other person is unconscious or physically unable to resist"; (2) "the other person has not consented and the actor knows the other person is unaware that the sexual assault is occurring"; or (3) "the actor has intentionally impaired the other person's power to appraise or control the other person's conduct by administering any substance without the other person's knowledge." *Id.* at §§ 21.011(b)(3), (5), (6).

McQuarrie concedes that the evidence was sufficient to establish the first two elements of the offense, but that it was insufficient to establish the third—a lack of consent. We disagree. In holding to the contrary, we consider the following evidence to be sufficient for a jury to rationally find that L.C. did not consent to sexual intercourse: (1) L.C. testified that she never would have consented to having sex with a man, and that the idea was "disgusting" to her; (2) L.C. was intoxicated (whether voluntarily or

8

involuntary) by drugs and alcohol to the point that she was not aware of what was happening; (3) despite the clear evidence that sexual intercourse had occurred, L.C. was unsure of what, if anything, occurred; (4) testimony indicated that L.C.'s behavior in the following days was consistent with other sexual assault victims' behavior; (5) testimony indicated that L.C. displayed behavior that would be consistent with someone who had been drugged, and McQuarrie provided L.C. with several drinks—either water or otherwise—that were prepared outside of her view and gave her a "light feeling" in her stomach; and (5) L.C. unequivocally testified that she did not consent to sexual intercourse.

We recognize that all of this evidence was controverted during the trial, but it is within the province of the jury to determine the credibility of the witnesses and to determine what weight is to be given to all of the testimony. *Wesbrook*, 29 S.W.3d at 111. Additionally, we must consider this contested evidence in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 319. When we evaluate the evidence under the framework in *Jackson*, we cannot say that no rational jury could find that L.C. did not consent to the sexual intercourse as there was some evidence to support a jury's finding that either L.C. was unconscious, unaware the assault was occurring, or had been involuntarily drugged. *See* TEX. PENAL CODE ANN. §§ 21.011(b)(3), (5), (6); *Jackson*, 443 U.S. at 319. Accordingly, we overrule McQuarrie's first and second issues.

## B. Outside Influence

By his third, fourth, and fifth issues, McQuarrie contends that he was deprived of his federal and state constitutional rights to due process and to an impartial jury "by a juror who conducted independent research on the internet during an overnight recess

9

and conveyed that information to the other jurors during deliberations the next morning." McQuarrie additionally contends that the trial court erred in excluding the affidavits of two jurors during the hearing on his motion for new trial. He contends, ultimately, that the jurors were influenced by evidence not admitted in trial, and therefore, he was denied a fair trial and that the trial court should have granted his motion for new trial.

A trial court's ruling denying a defendant's motion for new trial is reviewed under an abuse of discretion standard. *Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001). We do not substitute our judgment for that of the trial court, but rather, we will only find an abuse of discretion if the trial court's decision was unreasonable and made without reference to guiding principles. *Id.* The trial court did not consider the jurors' affidavits based on the fact that they did not fall within any exception listed in Texas Rule of Evidence 606(b), which provides that,

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror . . . .

TEX. R. EVID. 606(b).

McQuarrie recognizes that this Court has repeatedly held that "[a]n outside influence must emanate from outside the jury and its deliberations." *Soliz v. Saenz*, 779 S.W.2d 929, 931-32 (Tex. App.–Corpus Christi 1989, writ denied); *see also Brandt v. Surber*, 194 S.W.3d 108, 133 (Tex. App.–Corpus Christi 2006, pet. denied). McQuarrie's argument is that "this [C]ourt has continued to follow [this rule] without

10

analysis" and that it "should be re-examined." McQuarrie contends that the proper test should be whether the testimony would require the court to delve into the deliberations of the jury. *See Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000) (noting that juror testimony is permitted on certain specific issues, "provided such testimony does not require delving into deliberations").

Assuming, without deciding, that we would adopt such an approach in this case, the affidavits in question clearly require a delving into the jury's deliberations and would nevertheless be inadmissible because they require the court to take into consideration the factors that might have convinced each juror, how each juror weighed the evidence, and all the other conversations between jurors that may have rendered the external information harmless. Regardless of the foregoing, we continue to agree with our analysis in *Soliz* that:

> [a]n "outside influence" does not include information not in evidence, unknown to the jurors prior to trial, acquired by a juror and communicated to one or more other jurors between the time the jurors received their instructions from the court and the rendition of the verdict. To constitute "outside influence," the source of the information must be one who is outside the jury, i.e., a non-juror, who introduces the information to affect the jury's verdict. Information gathered by a juror and introduced to the other jurors by that juror, even if the information were introduced specifically to prejudice the vote, does not add up to outside influence.

*Soliz*, 779 S.W.2d at 932. The reasoning behind this rule was explained in the civil context by the Texas Court of Criminal Appeals:

> [This rule] is based upon controlling considerations of a public policy which in these cases chooses the lesser of two evils. When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for a new trial, the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what had happened in the jury room.

11

*State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194, 202 n.12 (Tex. Crim. App. 2003). Therefore, based on this rule, the jurors' affidavits in this case showed no evidence of outside influence whatsoever. Accordingly, the trial court properly excluded the affidavits and testimony, and it did not abuse its discretion in denying McQuarrie's motion for new trial on this basis. *See* TEX. R. EVID. 606(b); *Salazar*, 38 S.W.3d at 148.

McQuarrie next contends that, if we follow our *Soliz* line of cases, rule 606(b), as applied in this case, violates his constitutional right to a fair trial. We "presume that the rule approved by the Supreme Court and the Court of Criminal Appeals is constitutional," and "the burden is on the party challenging the statute to establish its unconstitutionality." *Luquis v. State*, 72 S.W.3d 355, 365 (Tex. Crim. App. 2002). The exclusion of a particular piece of evidence, even if it is necessary to a criminal defendant's case, will generally not constitute a constitutional violation, and a criminal defendant has a heavy burden to show a violation of his constitutional rights. *See Montana v. Egelhoff*, 518 U.S. 37, 43 (1996); *Ray v. State*, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005) (citing *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002)) ("[E]videntiary rulings rarely rise to the level of denying the fundamental constitutional rights to present a meaningful defense."); *see also Harper v. State*, No. 14-07-00422-CR, 2008 Tex. App. LEXIS 8013, at *22 (Tex. App.–Houston [14th Dist.] Oct. 23, 2008, no pet.) (mem. op., not designated for publication).

In *Richardson*, a nearly identical case, we held that "Rule 606(b) of the Texas Rules of Evidence, as applied, does not constitute a violation of [the defendant's] right to trial by jury as mandated by article I, section 15 of the Texas Constitution nor of his right to a fair and impartial jury as provided by the Sixth Amendment of the United States

Constitution." *Richardson v. State*, 83 S.W.3d 332, 362 (Tex. App.–Corpus Christi 2002, pet. ref'd) (citing *Hines v. State*, 3 S.W.3d 618, 622-23 (Tex. App.–Texarkana 2000, pet. ref'd); *Sanders v. State*, 1 S.W.3d 885, 888 (Tex. App.–Austin 1999, no pet.)). Moreover, in *Soliz*, our analysis was clear:

> In Texas, the right to a fair and impartial trial is guaranteed by TEX. CONST. art. 1, § 15 (Vernon 1984) and TEX. GOV'T CODE ANN. § 62.105 (Vernon 1987). TEX. CONST. art. 1, § 15 states, in relevant part, that "the right of trial by jury, shall remain inviolate," and that our legislature may pass laws needed to regulate this right and to maintain "its purity and efficiency." Appellants received a trial by jury. Their complaints stem from the jury's deliberative process. In fact, TEX. GOV'T CODE ANN. § 62.105 prevents a person from serving as a juror if that person has a bias or prejudice in favor of or against a party. The legislature and Supreme Court have adopted Rules 327(b) and 606(b) which state under what conditions a new trial can be received on the basis of jury misconduct. This is nothing more than an attempt to promote the "purity and efficiency" of the jury system. We hold, therefore, that rules 606(b) and 327(b) did not deny appellants their right to a fair and impartial trial by jury.

*Soliz*, 779 S.W.2d at 935. Accordingly, we overrule McQuarrie's third, fourth, and fifth issues.

### III. CONCLUSION

Finding no meritorious issues on appeal, we affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P.47.2(b).

Delivered and filed the
14th day of April, 2011.

13