In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-00-477 CR


____________________



REGINALD EUGENE MORRIS, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 410th District Court


Montgomery County, Texas


Trial Cause No. 00-06-03646-CR






OPINION


 A single indictment charged appellant, Reginald Eugene Morris, with three counts
of Intoxication Manslaughter, a second degree felony. Tex. Pen. Code Ann. § 49.08
(Vernon Supp. 2002). The charges stemmed from a collision between two boats on Lake
Conroe on July 17, 1999. A jury found appellant guilty of all three counts and assessed
punishment in each cause at confinement in the Texas Department of Criminal Justice -
Institutional Division for a period of twenty years, with an additional fine of $5,000 also
in each cause. Appellant presents eight issues for our consideration, none of which raise
legal or factual insufficiency of the evidence to sustain the convictions. We will reverse.

 The record reflects that sometime between 9:30 p.m. and 10:00 p.m., on July 17,
1999, a cabin cruiser in which the deceased were riding was struck by a "performance"
boat traveling at a high rate of speed. There is no disputing the fact that the key issue at
trial was who was driving the performance boat at the time it collided with the cabin
cruiser. (1) There was also no serious dispute at trial that immediately following the collision
only two individuals were present in the performance boat, appellant and a man identified
as Gary Carlin. The trial began on July 17, 2000. At the time of trial, Gary Carlin was
deceased, having died from an apparent drug overdose unrelated to the physical injuries
he sustained in the collision of the boats. 

 We begin by setting out the issues pertinent to this appeal. They involve the
admissibility of two sets of out-of-court statements made by Gary Carlin subsequent to the
collision. Issues one and two focus on statements made by Carlin to Trooper Angela
Fountain of the Texas Department of Public Safety. Issue five relates to statements by
Carlin to Amy Pinkerton, a claims representative for Progressive Insurance, made in late
September or early October of 1999. Carlin's statements to Trooper Fountain were
offered by the State with appellant's "hearsay" objection being overruled by the trial court.
 Carlin's statements to Ms. Pinkerton, however, were not admitted by the trial court and
appear in the record as an offer of proof. The three issues dispositive of this appeal read
as follows: 

 1. Whether the trial court erred in admitting Carlin's hearsay statements
made to a police officer in the emergency room that that (sic) Appellant was
the driver of the boat.


 2. Whether Carlin's statement to a police officer was properly admitted
pursuant to Tex. R. Evid. 705. 


 . . . .


 5. Whether the trial court erred in sustaining the State's objection to Gary
Carlin's statement that he was the driver of the boat because it was
impeachment evidence admissible pursuant to Tex. R. Evid. 806.


 Hearsay is a statement, other than one made by the declarant while testifying at the
trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R.
Evid. 801(d). Hearsay is inadmissible unless expressly excepted or excluded from the
general rule by statute or the rules of evidence. Tex. R. Evid. 802. A statement is not
hearsay if it is offered against a party and is the party's own statement in either an
individual or representative capacity. Tex. R. Evid. 801(e)(2)(A). "Rule 801(e)(2)(A)
plainly and unequivocally states that a criminal defendant's own statements, when being
offered against him, are not hearsay." Trevino v. State, 991 S.W.2d 849, 853 (Tex. Crim.
App. 1999). 

 Several exceptions to the hearsay rule also exist. See Tex. R. Evid. 803. Among
the exceptions are statements against interest. Tex. R. Evid. 803(24). These are
statements made by a declarant which tend to subject the declarant to criminal liability, and
a reasonable person in the declarant's position would not have made the statements unless
he believes them to be true. Id. The hearsay exception for statements against a declarant's
interest and the exclusion for admissions by a party-opponent are distinct. See Bingham
v. State, 987 S.W.2d 54, 56 (Tex. Crim. App. 1999). "While statements against interest
are admissible due to their reliability, admissions by party-opponents are admissible
precisely because they are being admitted against the party alleged to have made those
statements." Id. at 56-57. 

 "It is well settled that an out-of-court 'statement' need not be directly quoted in
order to run afoul of the hearsay rules." Head v. State, 4 S.W.3d 258, 261 (Tex. Crim.
App. 1999) (citing Schaffer v. State, 777 S.W.2d 111, 114 (Tex. Crim. App. 1989)). 
Finally, whether otherwise inadmissible hearsay evidence comes in under one of the
exceptions or exclusions to the hearsay rule is a question for the trial court to resolve and
is reviewable for abuse of discretion. See McNair v. State, 75 S.W.3d 69, 71 (Tex. App.--San Antonio 2002, no pet.). As a reviewing court, we do not conduct a de novo review;
rather, we determine whether the record supports the trial court's ruling. Id. Under such
a review, if the decision of the trial court is correct on any theory of law which finds
support in the evidence it will be sustained. Id. 

STATEMENT 1: CARLIN TO TROOPER FOUNTAIN


 We reproduce the pertinent portions of testimony necessary for our analysis of
issues one and two which relate directly to Trooper Fountain's testimony of her interview
of Gary Carlin at the hospital the night of the collision. Trooper Fountain testified that she
was directed by her supervisor, Sergeant Pullen, to go to the hospital where the persons
injured in the collision had been taken. Fountain further stated that upon her arrival at the
hospital she was basically in control of the investigation from that location. Her direct
examination testimony continues thusly: 

 Q.[State] And what kind of information did you obtain from Sergeant
Pullen? 


 A.[Fountain] At that point we were in a rescue-type mode because we were
very uncertain about how many people were on each boat, who we had
accounted for and who we did not have accounted for. And, basically, he
told me how many people we had in the hospital, which rooms they were in,
and we were still trying to ascertain if we had everyone accounted for. 


At this point, it would have been quite simple for the State to have asked if the authorities
ultimately accounted for all individuals on both boats, and Fountain could have answered
in the affirmative. As neither party was contesting the fact that all people from both boats
had been accounted for further inquiry on the subject was collateral to the key issue of
which man was the operator of the performance boat at the time of the collision. 
Nevertheless, the State pursued the line of inquiry further without objection from
appellant's trial counsel, viz: 

 Q. You went to - - Which person did you speak with first?


 A. I recall speaking with Mr. Carlin first.


 . . . .


 Q. And then did you ask him [Carlin] a number of questions?


 A. I asked him two to three questions. Yes, sir.


 Q. And from those questions were you able to determine who was in the
boat that Mr. Carlin was in?


 A. Mr. Carlin - - I learned that there were two people in his boat.


 Q. Without telling me what he said, can you tell me this answer: Did you
determine how many people were in the boat?


 A. Yes, sir, I did.


 Q. And did you determine the name of the person that he claimed to be
driving?


 A. Yes, sir, I did.


 [Trial Counsel]: Objection, hearsay.


 THE COURT: Overruled.


 . . . .


 Q. Now, in response to that did you go to another location in the hospital?


 A. Yes, sir.


 Q. And was it in response to Mr. Carlin's statements that you went to the
other location?


 A. Yes, sir, it was.


 Q. And when you went to that other location, who was in that location?


 A. The subject that I learned the last name was Morris.


 Q. And did you speak with Mr. Morris at that time? 


 A. Yes, sir, I tried to.


 Q. Now, Mr. Morris had some injuries, did he not?


 A. Yes, sir, he did.


 Q. And can you describe the facial injuries, if you remember?


 A. Severe facial injuries, a complete laceration underneath the bottom lip
that basically went all the way across his face. Very severe facial injury.


 . . . .


 Q. Was Mr. Morris conscious?


 A. Yes, sir, he was.


 Q. And did you ask him how many occupants were in the boat?


 A. Yes, sir, I did.


 Q. What was his response?


 A. He said two.


 Q. Did you ask who was driving?


 A. Yes, sir, I did.


 Q. And did he give you an answer?


 A. Yes, sir, he did.


 [Trial Counsel]: Objection, hearsay.


 THE COURT: Overruled.


 A. He said - - He gave me a female's name, and I can't recall the name of
the female at that time.


 Q. And then after that, did you ask him any further questions at that point?


 A. No, sir, I did not.


 While the State was certainly permitted to have Trooper Fountain recount
appellant's non-custodial statement placing blame elsewhere for the operation of the
performance boat at the time of the collision, we continue to puzzle over the State's need
to include anything said to the Trooper by Gary Carlin. Recall that at the time of trial
Gary Carlin was deceased. Once again, however, the State presses on with Trooper
Fountain on the totally collateral issue of accounting for all the collision victims. The
record continues: 

 Q. So after you spoke with Mr. Morris, where did you go next?


 A. Recall going back to Mr. Carlin's room.


 Q. What did you ask Mr. Carlin at that time?


 A. Again, basically the same questions: How many people were on your
boat? Who was driving?


 Q. Let me back up actually. I'm sorry for jumping around like this.


 A. Yes, sir.


 Q. When Mr. Morris gave you the name that sounded like a female, did he
tell you where that female person went?


 A. Yes, sir, he did. He said that she had jumped overboard.


 Q. Now, we go back to Carlin. You told him that - - you told Carlin what
you had heard from Mr. Morris; is that correct?


 A. No, sir, not at this time. I asked him, simply again, how many people
were in his boat and who was driving the boat.


 Q. And did he give a number that was consistent with the previous response
he gave you?


 A. Yes, sir, he did.


 Q. And then did you ask again who was driving?


 A. Yes, sir, I did.


 Q. And did he give an answer that was consistent with the answer he gave
you previously?


 A. Yes, sir, he did.


 . . . .


 Q. And what did you do after that?


 A. Basically Sergeant Pullen was still around and conferred with him about
the information that I had received at that point.


 Q. And what did you tell Sergeant Pullen?


 A. Basically, that I felt that we were comfortable that we had everyone
accounted for. I had asked on numerous occasions how many people were
in each boat and were getting consistent answers. So I felt like we could go
to more an investigative mode at that point instead of a rescue.


 Q. How is it that you felt you were getting consistent answers when Mr.
Morris was saying there was a female on the boat? Did anyone else indicate
that there was a female on the boat of all the persons you talked to?


 A. No, sir.


 It is at this point that we need to note that, contrary to the contention of the State
in its brief, it is the State who initially implied that Trooper Fountain "was unreasonable
or irresponsible in accounting for everyone in the accident[.]" We reiterate that the
authorities' "accounting for everyone in the accident" was not a material issue in the case. 
At any rate, the alleged criticism by appellant's trial counsel of the authorities' rescue
investigation appears, according to the State, during the following portion of Fountain's
cross-examination: 

 Q.[Appellant's Counsel] When Mr. Morris was telling you, as you testified,
that somebody jumped overboard; what did you do in response to that?


 A.[Trooper Fountain] Nothing.


 Q. You didn't contact anybody out on the scene to see if somebody was
swimming across the lake?


 A. No, sir.


 Q. I get the impression, then, that as far as whatever Mr. Morris told you,
you didn't believe to any appreciatable (sic) degree at all, did you?


 A. No, sir, that's not true.


 Q. So you did believe it or didn't know whether to believe it or weren't
acting upon it or what?


 A. I knew it was very inconsistent with the statements I had received from
everyone else.


 Q. And if Mr. Morris was in the hospital and in that area of the hospital
knowing that other people with knowledge of all of those events are also in
that hospital with you and him, he'd know you'd have plenty of sources to
go to verify something, wouldn't he?


 A. I can't say what Mr. Morris would think, no, sir, I cannot.


 Q. And that's my point. Have you consulted with any of the medical
doctors or have you consulted with any of the medical records to ever
determine what the extent of the head trauma and the symptoms that it
produced, as far as Mr. Morris's injury?


 A. No, sir, I have not.


 Q. You don't know whether or not he might have been at some form of an -
- or suffering under some degree of a concussion of some kind?


 A. No, sir, I have not.


 Q. Within your training and experience, have you ever seen anybody that
was in some kind of a concussion condition who had become autonomic,
walked and talked just like normal but didn't have any idea what they were
saying?


 A. Yes, sir, I have.


 Q. You have?


 A. Yes, sir, I have.


 Q. You don't know whether he was in that condition at all, do you?


 A. That's correct, I do not.


 Rather than a critique of the authorities' rescue investigation or of Trooper
Fountain's "accounting" investigation, it appears that appellant's trial counsel was trying
to establish that appellant's responses to Fountain regarding a woman driving the boat were
products of the severe head trauma appellant had sustained in the collision. Nevertheless,
on re-direct, the State, under its "rehabilitative rebuttal" theory of admissibility [our term],
was permitted to elicit from Fountain the questionable statements from Carlin. We
reproduce this exchange below. Curiously, and contrary to their rehabilitation theory of
admissibility, the State begins its re-direct examination of Fountain with questions that
appear to be setting up some sort of "excited utterance" theory of admissibility. This is
puzzling as it would appear that at trial the State must have believed that Carlin's
statements were indeed hearsay requiring proof of an exception to the hearsay rule for
admissibility. See Tex. R. Evid. 803(2) (excited utterance exception). In its reply brief,
however, the State asserts Carlin's statements are not hearsay under its rehabilitative
rebuttal theory of admissibility. 

 Q.[State] At one point when you went back and forth between Mr. Morris
and Mr. Carlin, when you went back with the inconsistent statements to Mr.
Carlin, what was Mr. Carlin's - - did he exhibit behavior that indicated he
was excited?


 A.[Fountain] Yes, sir, he did.


 Q. Agitated?


 A. Yes, sir, he did.


 Q. And can you describe that for the jury.


 A. I believe it was on my second trip back to Mr. Carlin's room when I had
already visited Mr. Morris, and Mr. Morris said that another female was
driving. I again returned to Mr. Carlin's room and asked him how many
people were on his boat, who was driving. I learned that there were two
people on the boat, that Mr. Morris was driving the boat.


 [Trial Counsel]: Objection, hearsay.


 THE COURT: Overruled.


 Q.(By [State]) And can you tell us just - - when he - - when Mr. Carlin was
saying this, was he saying it in the same fashion you're saying or was he
kind of - - what was he like?


 A. He was excited, trying to provide me the information that I was looking
for. 


 Q. I guess "excited" might not be the right word. How was it? What did
it look like?


 A. Very nervous and very eager to provide information and assist me any
way I needed to be assisted.


 Q. Was he responding to your questions or more was he blurting this stuff
out?


 A. He was responsive. But by that time, I had asked him these questions
already. And he would jump the gun before I'd even get the entire question
out, and answer it.


 Q. So when you asked him on the second go-round who was driving the
boat, what did he respond to?


 A. He said that Dusty was driving the boat. That's how he referred to Mr.
Morris - - 


 [Trial Counsel]: Objection, hearsay.


 THE COURT: Overruled.


 A. And I said - - I told Mr. Carlin that Mr. Morris had said that he was
driving the boat, that he said someone else was driving the boat. And he
became very agitated very quickly and said, "That's not true. Dusty was
driving the boat. He never let anybody else drive his boat."


 [State]: I'll pass the witness. Thank you. 


 From the above-quoted portion of the record and from the State's reply to issue one,
we see two theories of admissibility of Carlin's statements presented. First, there is the
"excited utterance" theory the State attempted to show through Trooper Fountain and
mentioned as a basis by the State during the trial. Second, the brief postulates the
"theory" we have previously referred to as "rehabilitative rebuttal" of the authorities'
rescue investigation. However, the record also indicates a third possible theory. For
reasons not apparent from an examination of the jury charge conference, the trial court
also included the following instruction to the jury:

 There has been admitted into evidence certain heresay [sic] statements
made by Gary Carlin. Such statements may be considered, if at all, as an
explanation or support for the experts [sic] opinions however may [sic] not
be considered for the truth thereof. 


 Because no objection was made to the trial court's submission of this instruction,
issue two is not preserved for appellate review, and we do not decide the legal propriety
of the trial court's having submitted it to the jury. See Tex. R. App. P. 33.1. However,
as the instruction indicates another theory of admissibility for Gary Carlin's statements to
Trooper Fountain, we feel we must examine it along with the other two theories raised in
the record. 

 As noted above, the trial court included a limiting instruction to the jury based
apparently upon Tex. R. Evid. 705. The provisions of Rule 705 read as follows:

 (a) Disclosure of Facts or Data. The expert may testify in terms of
opinion or inference and give the expert's reasons therefor without prior
disclosure of the underlying facts or data, unless the court requires
otherwise. The expert may in any event disclose on direct examination, or
be required to disclose on cross-examination, the underlying facts or data.


 (b) Voir dire. Prior to the expert giving the expert's opinion or disclosing
the underlying facts or data, a party against whom the opinion is offered
upon request in a criminal case shall, or in a civil case may, be permitted to
conduct a voir dire examination directed to the underlying facts or data upon
which the opinion is based. This examination shall be conducted out of the
hearing of the jury.


 (c) Admissibility of opinion. If the court determines that the underlying
facts or data do not provide a sufficient basis for the expert's opinion under
Rule 702 or 703, the opinion is inadmissible.


 (d) Balancing test; limiting instructions. When the underlying facts or
data would be inadmissible in evidence, the court shall exclude the
underlying facts or data if the danger that they will be used for a purpose
other than as explanation or support for the expert's opinion outweighs their
value as explanation or support or are unfairly prejudicial. If otherwise
inadmissible facts or data are disclosed before the jury, a limiting instruction
by the court shall be given upon request.


 Hearsay, not otherwise exempted or excluded by the Rules of Evidence, is subject
to the conditions set out under Rule 705(d) involving the limited admissibility of
"underlying facts or data" of an expert's opinion. See Aguilar v. State, 887 S.W.2d 27,
30 (Tex. Crim. App. 1994). In the instant case, neither side requested the limiting
instruction. Furthermore, Trooper Fountain's testimony recounting Carlin's statements
took place prior to the State's marine accident reconstruction expert, Robert Loeser's,
testimony. Most importantly, while Mr. Loeser did testify out of the jury's presence that
a statement of Gary Carlin was one of the "statements" he relied upon in reaching his
opinion, there is no further clarification that it was Carlin's statement to Trooper Fountain
of which Loeser was referring, and no individuals were mentioned by name to the jury in
connection to the "statements" Loeser reviewed in forming his opinion. Based upon the
particular facts and circumstances present in the record before us, Rule 705 provided no
basis for admission of Gary Carlin's out-of-court statement to Trooper Fountain. 

 As noted above, the State's appellate brief argues admissibility under what we call
the theory of rehabilitative rebuttal. We reiterate our belief that the testimony indicates
it was the State, not appellant's trial counsel, that called into question Trooper Fountain's
rescue investigation. We further believe that the entirety of the cross-examination
testimony of Trooper Fountain indicates that appellant's trial counsel was trying to show
that anything appellant told Fountain at that time should not have been believed by the
Trooper because of the severity of appellant's head injuries. Nevertheless, we will
examine the State's rehabilitative rebuttal theory of admissibility. 

 The State refers us to two cases in support of its position: Carter v. State, 172 Tex.
Crim. 95, 353 S.W.2d 458 (1962), and Cardenas v. State, 971 S.W.2d 645 (Tex. App.--Dallas 1998, pet ref'd). Initially, we observe that Carter is a pre-Rules of Evidence case
and may no longer be the current state of the law on what appears to be an issue of
admissibility of "background contextual evidence." See Rogers v. State, 853 S.W.2d 29,
32 (Tex. Crim. App. 1993)(opinion on rehearing). Carter's authority on the point is
tenuous at best.

 The State's reliance on Cardenas is also misplaced. Cardenas was a murder case
in which there were two shooters, the defendant Cardenas and another individual, Alex
Morales. Id. at 648-49. Prior to the trial, Alex Morales died in an unrelated incident. 
Id. at 649. On cross-examination of a detective assigned to the case it was learned that
certain witnesses implicated Alex Morales as the killer. Id. at 649-50. Defense counsel
then posed the following questions to the detective:

 Q. Did you not follow up on your information that Alex Morales was
involved in this killing?


 A. Yes, sir, I interviewed Alex Morales.


 Q. Even though witnesses told you he [Alex] was shooting, you didn't see
it necessary to file charges on him?


 A. No, sir. 


Id. at 650. On re-direct, the detective was permitted to testify, over a hearsay objection,
that Alex Morales admitted in a written statement he (Alex) had a .22 caliber revolver at
the scene of the shooting and that he (Alex) shot in the air to break up a fight. Id. The
trial court further permitted the detective to testify as to what Morales said about Cardenas'
involvement in the killing; stating that Morales indicated Cardenas fired a .25 caliber
automatic weapon towards the pickup truck where the victim was riding and later Cardenas
bragged about the killing. Id. 

 The Dallas Court, relying on the law of hearsay, found the out-of-court statement
of Morales about his own involvement in the shooting not hearsay. It is this portion of the
opinion upon which the State in the instant case relies. It is not, however, the end of the
Dallas Court's discussion on the matter. At the beginning of its discussion, the Dallas
Court noted that, with regard to an out-of-court statement, if the statement's probative
value does not hinge on its truthfulness, then it is not offered to show the truth of the
matter asserted and is not hearsay. Id. The Court addressed admissibility of the other half
of Morales' written statement to the detective as follows: 

 We arrive at a different conclusion, however, with respect to Alex's
statements about appellant's involvement in the crime. Although one bullet
killed David DeLeon, the evidence clearly shows two different gunmen shot
at the time David was murdered. Alex's statement to police that appellant
fired the fatal bullet did not exclude Alex's possible liability or arrest as a
party to the murder. Accordingly, Alex's out-of-court statements identifying
appellant as the person who fired the bullet that killed the victim are
nonprobative with respect to why the detective did not arrest Alex when Alex
possibly could have been arrested as a party to the murder. As such, they
are hearsay.


Id. at 650-51. (emphasis in original). The Dallas Court further rejected the State's
argument that defense counsel's cross-examination of the detective invited the State to
present such hearsay testimony, viz:

 "[O]pening the door" or "inviting" testimony that would otherwise pertain
to inadmissible subject matter does not mean that such testimony is
necessarily invited into evidence in any form, including hearsay. Kipp v.
State, 876 S.W.2d 330, 337 (Tex. Crim. App. 1994)(plurality opinion). In
other words, a conclusion that appellant opened the door to the subject of
why the detective did not arrest Alex does not suspend the hearsay rules. 
The State does not assert the applicability of any other hearsay exception. 
We conclude the trial court improperly overruled appellant's hearsay
objection to Alex's out-of-court statements about appellant's involvement in
this offense.


Id. at 651. (emphasis in original). 

 As noted above, in the instant case the State contended the cross-examination of
Trooper Fountain impugned the thoroughness of the rescue investigation of the authorities
by possibly failing to account for all individuals aboard the two boats when they collided. 
We believe that having Trooper Fountain repeat Carlin's specific identification of appellant
as the driver of their boat at the time of the collision had no probative value under the
State's theory of admissibility and was certainly more prejudicial than probative
considering the only real issue in the case was which man was operating the performance
boat when it struck the cabin cruiser.

 In Cardenas, the cross-examination of the detective was essentially an attack on the
State's case in that it appeared that the police may have permitted the actual killer,
Morales, to go free or at least failed to arrest a party to the killing. As we have previously
noted, in the instant case there was no true controversy with regard to the number and
identities of all individuals aboard each boat when the collision took place. Although the
obvious defense strategy at trial was that appellant was not operating the boat at the time
of the collision, the defense did not contend that a "third party" who remained
unaccounted-for was the operator. The defense's trial strategy clearly attempted to show
that it was Gary Carlin who was operating the boat when it struck the cabin cruiser. 

 Certainly an out-of-court statement specifically identifying the driver of the boat by
name would be compellingly probative evidence. However, Carlin's statements are only
probative when used for the truth of the matters asserted; which makes the statements
inadmissible hearsay. Again, under the unique facts and circumstances in the record,
Carlin's out-of-court statements specifically identifying appellant as the driver of the boat
along with the further comment, "He never let anybody else drive his boat[,]" were not
probative to the collateral issue of whether the authorities had accounted for all passengers
in each boat following the collision. We therefore find the State's rehabilitative rebuttal
theory of admissibility of the out-of-court statements to be improper.

 Lastly, admissibility of Carlin's statement to Trooper Fountain under the hearsay
exception of "excited utterance," Rule 803(2), is simply not supported by the evidence
before us. The excited utterance hearsay exception permits admission of a hearsay
"statement relating to a startling event or condition made while the declarant was under the
stress of excitement caused by the event or condition." Tex. R. Evid. 803(2); Salazar v.
State, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001), cert denied, ___ U.S. ___, 122 S.Ct.
127, 151 L.Ed.2d 82 (2001). It is not dispositive that the statement is an answer to a
question or that it was separated by a period of time from the startling event; these are
simply factors to consider in determining whether the statement is admissible under the
excited utterance hearsay exception. Salazar, 38 S.W.3d at 154. The critical
determination is whether the declarant was still dominated by the emotions, excitement,
fear, or pain of the event or condition at the time of the statement. Id.

 The theory of the excited utterance exception is that circumstances may produce a
condition of excitement that temporarily stills the capacity for reflection and produces
utterances free of conscious fabrication. 2 Good, Wellborn & Sharlot, Texas
Practice: Texas Rules Of Evidence: Civil And Criminal § 803.3 (2nd ed. 1993). 
This type of hearsay is deemed reliable, and therefore admissible, to the extent it is the
spontaneous, involuntary product of an excited state of mind. See Parks v. State, 843
S.W.2d 693, 697 (Tex. App.--Corpus Christi 1992, pet. ref'd). 

 In the instant case, any excitement, nervousness, or eagerness on Carlin's part, as
described by Trooper Fountain, appears to only have been the result of her questioning
him as to who was driving the performance boat, or confronting Carlin with appellant's
statement that an unidentified "female" was driving the boat. We do not believe the
excited utterance exception was intended to apply to such a situation. Carlin's excitement
or eagerness to assist Trooper Fountain's inquiries could have easily been the product of
a guilty conscience wanting to deflect his guilt onto the only other person actually in the
boat, that being the appellant. We find, therefore, that it would have been improper to
admit Carlin's statements under Rule 803(2). 

 We find abuse of discretion by the trial court in permitting Trooper Fountain to
testify to the inadmissible hearsay statements of Gary Carlin. Appellant's first issue is
sustained. We will postpone the substantial rights analysis under Tex. R. App. P. 44.2(b)
temporarily and combine said analysis with the one following our discussion of issue five
as we find an abuse of discretion there as well. 

STATEMENT 2: CARLIN TO AMY PINKERTON


 During the case for the defense, appellant's trial counsel attempted to call Amy
Pinkerton as a witness. We reproduce the entirety of the events surrounding the calling
of Ms. Pinkerton as well as her testimony recorded out of the jury's presence: 

 [Trial Counsel 1]: I think that the next witness that we need to
produce needs to be taken out of the presence of the jury because of the
nature of her testimony.


 [State]: We don't object. If it's got to be done, that will be fine.


 [Trial Counsel 1]: She's going to testify as to statements made by
Carlin.


 THE COURT: Well, that's going to be denied. I'm not going to let
that in.


 [Trial Counsel 1]: It's strictly for the bill.


 [Jury exits courtroom]


 [Trial Counsel 1]: May we bring her on in, Judge?


 THE COURT: Yes.


 [State]: Judge, if we could approach briefly?


 THE COURT: Yes.


 (At the Bench, on the record)


 [State]: Again, Your Honor, if they're going to go into what we
believe to be inadmissable and prejudicial statements, we'd ask that this be
done outside - - there's media present. We'd ask if we could go in
chambers.


 THE COURT: Okay. Go in chambers.


 (Chambers, defendant present, no jury)


 [State]: Judge, I appreciate your honoring our request on this. We did
feel that the nature of the testimony is wholly inadmissible, that it's
impeachment of a witness who's never testified.


 THE COURT: Isn't that called the dead man's statute?


 [State]: No, sir. There's nothing in there that applies in this case,
Judge. I've looked through it. 


 THE COURT: Oh, it doesn't? The dead man's statute doesn't apply?


 [State]: No, sir.


 [Trial Counsel 1]: I think we agree with that. There are some laws,
and so forth, that we need to argue. But that's the reason, Judge, that I
approached the bench before calling this witness in in front of jury.


 THE COURT: What - - what's the rule?


 [Trial Counsel 2]: Rule 803, subparagraph 24, Your Honor. It's just
a statement against interests hearsay exception. And the - - 


 [Trial Counsel 1]: Testimony is going to be just very simple. Can we
get that behind us and then?


 THE COURT: I want to see the rule. Rule 803 what?


 [Trial Counsel 2]: 24.


 [Trial Counsel 1]: Can I get her to go ahead and state her name for
the record, Judge?


 THE COURT: Uh-huh.


 AMY PINKERTON, having been first duly
sworn, testified as follows:


DIRECT EXAMINATION



 BY [Trial Counsel 1]:


 Q. Would you state your name for the record, please, ma'am.


 A. Amy Pinkerton.


 Q. And would you spell that for the court reporter, please, ma'am.


 A. P-I-N-K-E-R-T-O-N.


 [Trial Counsel 1]: If I can proceed, Judge, it won't take me five
minutes.


 THE COURT: Yes.


 Q. Ms. Pinkerton, how are you employed?


 A. I work for Progressive Insurance.


 Q. And what is your position with Progressive Insurance?


 A. Claims handler, claims representative.


 Q. And where are you currently living?


 A. Brandon, Mississippi.


 Q. When were you transferred there?


 A. April.


 Q. Were you prior to that time living and working in Harris County?


 A. Yes.


 Q. And tell the Court what your position at that time was.


 A. I was a claims processor.


 Q. In connection with your work, did you ever have an opportunity to come
in contact with an individual by the name of Gary Carlin?


 A. Yes, sir.


 Q. And was that - - would you tell the Court what it was that brought you
in contact with Gary Carlin?


 A. I had actually called him to get directions to his house in reference to a
claim that he had filed on his automobile insurance.


 Q. Okay. And that claim - - 


 THE COURT: On his automobile insurance?


 A. Yes, sir.


 THE COURT: Okay.


 Q. And that claim has absolutely nothing to do with the matter before the
jury today involving the boat wreak; is that correct?


 A. To the best of my knowledge, that's correct.


 Q. Okay. And what type of claim was this that you wanted to talk to Gary
Carlin about?


 A. He had run over some mailboxes.


 Q. And in the process of talking with him, did something happen that
caused you to become very concerned?


 A. Yes. Mr. Carlin was telling me that his life was worthless and that he
had no reason to live. And I felt that he was suicidal.


 Q. Let me stop right there and spring off to another area. Have you had
training with regards to emergency calls and 911 calls?


 A. Yes, sir.


 Q. Would you tell the Court what type of education, background, or
training you have had in connection with handling 911 calls?


 A. I put myself through college as a 911 operator.


 Q. And what are the things that you look for or that are alarm signals in
connection with - - 


 THE COURT: Wait just a minute. Were you there?


 [State]: Excuse me?


 THE COURT: Did you have chance to cross-examine this witness?


 [State]: No, sir.


 THE COURT: You didn't have a chance? You weren't there?


 [State]: No, sir.


 THE COURT: When this witness said what he's about to say; is that
right?


 [State]: That's correct.


 THE COURT: Okay. So it would be a statement.


 [State]: It's a hearsay statement - - 


 THE COURT: No kidding. And you weren't there to cross, were
you?


 [State]: No, sir.


 THE COURT: Okay. All right. Go ahead.


 [Trial Counsel 1]: Judge, if I can, it's just like the hearsay statements
that - - well, we'll get into that argument later, I'm sorry - - discussion,
excuse me. 


 Q.[Trial Counsel 1] Were you trained to pick up various different nuances,
and so forth, and voices to - - that would alarm you?


 A. Yes.


 THE COURT: This is ridiculous. This is ridiculous.


 [Trial Counsel 1]: Judge, you know, I apologize to the Court if you
think it's ridiculous.


 THE COURT: Oh, it is. It's totally ridiculous.


 [Trial Counsel 1]: When we have a statement from Gary Carlin - - 


 THE COURT: No, you don't have a statement from Gary Carlin yet.


 [Trial Counsel 1]: We have someone who can testify as to statements
from Gary Carlin, like other witnesses on the witness stand have already
been permitted to testify to. Other witnesses have testified as to statements
made by Gary Carlin.


 THE COURT: In the hospital while he's being treated at the scene of
the accident, he responded to questions by a peace officer and a nurse
personnel. That's the statement you have.


 [Trial Counsel 1]: If we could wait until the argument and the statute
and cases and let me just finish with this lady so I can get her - - 


 THE COURT: Well, I don't know if there's any need to finish with
her, based upon your last question.


 [Trial Counsel 1]: What, that she's qualified to - -


 THE COURT: That she has some type of special talent?


 [Trial Counsel 1]: She doesn't need this special talent.


 THE COURT: Some nuances, to pick up nuances and things of that
nature in a person's voice.


 [Trial Counsel 1]: I'll forget all that.


 Q.[Trial Counsel 1] Did Gary Carlin at some point in time make a statement
to you with regards to his involvement in the boat accident case?


 A. Yes, sir, he did.


 Q. And would you tell the Court and the jury what that comment was?


 THE COURT: "Would you tell the Court."


 [Trial Counsel 1]: I'm sorry. Excuse me.


 A. Yes, sir. He told me he was driving the boat at the time of the accident. 


 Q. Was that the total of what he said?


 A. No. He was going on about his injuries, and he was detailing his
injuries and telling - - he asked me if I had remembered a boat accident on
Lake Conroe a few months previous that killed a couple of people, and I told
him, yes, and he said, "I was driving the boat."


 Q. Did his demeanor cause you any concern about his welfare?


 A. Yes, sir. I called Montgomery County Sheriff's Department.


 Q. Why?


 A. Because I thought he was going to commit suicide or endanger my
claim's representative that I had en route to his residence.


 Q. Subsequently - - 


 THE COURT: Did all this go on on the phone?


 A. Yes, sir.


 THE COURT: Oh. You weren't in his presence?


 A. No, sir.


 THE COURT: This was a phone conversation?


 A. Yes, sir. 


 Q.[Trial Counsel 1] And is that basically the extent of - - 


 THE COURT: This was not a face-to-face conversation with Gary
Carlin?


 A. No, sir, it was not.


 THE COURT: Oh. Okay. 


 Q.[Trial Counsel 1] Is that basically the extent of your involvement or your
communication with Gary Carlin regarding the boat accident?


 A. Yes, sir. Yes, sir. 


 [Trial Counsel 1]: We'd pass for cross-examination.


CROSS-EXAMINATION



 BY [State]:


 Q. If you can, can you tell me when this occurred?


 A. Yes, sir. It was late September, early October. 


 Q. And how many conversations prior to this had you had with Mr. Carlin?


 A. None. 


 Q. So you don't know who you were actually speaking with?


 A. Actually, I stayed on the phone with him until my claims representative
got there.


 Q. But you don't know from that conversation - - you couldn't recognize his
voice; is that correct?


 A. Not at that point, no, sir. I spoke with him several times after that
regarding other claims that he had. But at that point, no, sir.


 Q. What circumstances surrounding this statement indicate that
trustworthiness of the statement itself?


 A. I don't understand.


 Q. Why is there anything - - is there anything that leads you to believe that
he was telling the truth in this case in making this statement?


 A. Well, I don't think he wasn't telling the truth in this case. But he was
very distraught and it was like he was unloading everything that was on his
chest, and I just got him to talking. That's what I was trained to do was
make somebody talk. So I got him talking and. (sic)


 Q. So you said you thought he was suicidal; is that correct?


 A. Yes, sir, I did.


 Q. Would you agree with me that people make a lot of strange statements
when they're suicidal?


 A. They could, yes, sir. 


 Q. And that happens pretty normally, doesn't it?


 A. Well, I don't know that "strange." You know. They tell you why their
life isn't worth living. So, yeah, I would agree with that.


 Q. Did you record the conversation?


 A. No, sir, I didn't. We do have recorders, but they only go on when we
turn them on, and I didn't think to turn it on.


 [State]: I have no further questions.


 [Trial Counsel 1]: Just about three other questions.


REDIRECT EXAMINATION



 BY [Trial Counsel 1]:


 Q. You said that your adjuster that you had sent out to the house did arrive;
is that right?


 A. Yes, sir, that's correct.


 Q. And did you subsequently talk to your adjuster on the telephone?


 A. Yes, sir. My adjuster requested that I call Montgomery County Sheriff's
Department back and - - 


 Q. - - cancel the dispatch?


 A. - - cancel the dispatch. 


 Q. Did he positively - - to your knowledge did he positively identify the
individual as Gary Carlin?


 A. Yes, sir, he did. 


 Q. And there's no question in your mind that that's who you were talking
to?


 A. There's no question in my mind, sir.


 At this point, the record reflects that Ms. Pinkerton was excused, the State excused
itself to consult with the office's appellate division, and then objected to Ms. Pinkerton's
testimony. The subsequent argument between counsel initially focused on the admissibility
of Ms. Pinkerton's testimony under Rule 803(24), statement against interest. However,
appellant's trial counsel then made the following assertion: 

 [Trial Counsel 1]: By the testimony presented from the district
attorney's office, Gary Carlin has in essence been able to testify as a witness
in abstentia [sic] by quoting things that he supposedly has said. If it's not a
witness in abstentia, [sic] it is more or less a witness by proxy because you
have permitted other people to testify that Gary Carlin said this, that and the
other. Thus, I think that because he has been permitted to put in - - the DA
has been permitted to put in testimony, to that effect we are entitled the put
in [sic] testimony that would be in impeachment of the testimony proffered
or offered by the district attorney's office and accepted before the jury. 


Shortly thereafter, the trial court denied appellant's request to present the testimony of Ms.
Pinkerton. 

 Texas Rules of Evidence 806 reads, in pertinent part, as follows:

 When a hearsay statement . . . has been admitted in evidence, the
credibility of the declarant may be attacked, . . . by any evidence which
would be admissible for those purposes if declarant had testified as a
witness. Evidence of a statement or conduct by the declarant at any time,
offered to impeach the declarant, is not subject to any requirement that the
declarant may have been afforded an opportunity to deny or explain. 


The State responds with two arguments: (1) that Rule 806 does not apply because Carlin's
statements to Trooper Fountain were not hearsay; and (2) Carlin's statements to Ms.
Pinkerton do not meet "the only hearsay exception under which it was offered." We reject
the State's first argument quickly by noting our discussion and ruling set out above that
Carlin's statements to Trooper Fountain were indeed inadmissible hearsay. With regard
to it's second argument, the State's attempt to limit the scope of admissibility of Ms.
Pinkerton's testimony solely to the requirements of Rule 803(24) is misplaced. Rule 806
provides the declarant of a previously admitted hearsay statement may have his/her
credibility attacked by any evidence "admissible for those purposes" if the declarant had
testified as a witness. As trial counsel pointed out to the trial court, Ms. Pinkerton's
testimony was admissible to impeach Carlin's previously admitted out-of-court statements
to Trooper Fountain to the effect that it was appellant who was operating the boat at the
time of the collision. 

 If Carlin had been alive at the time of trial either party could have called him as a
witness and would have been permitted to impeach his credibility by examining him
concerning any prior statements made that were inconsistent with his trial testimony. See
Tex. R. Evid. 607; 611(b); 613. Under Rule 613(a), in order to impeach a testifying
witness with a prior inconsistent statement, a party must first give the witness the
opportunity to explain or deny such statement. However, Rule 806 explicitly waives this
requirement. Therefore, under Rule 806, Ms. Pinkerton's testimony regarding Carlin's
statements admitting to having been the driver of the boat at the time of the collision were
admissible as evidence of a prior inconsistent statement. 

 We do note that the State's reliance on Davis v. State, 791 S.W.2d 308 (Tex. App.--Corpus Christi 1990, pet. ref'd), is again misplaced under the circumstances of the instant
case. In that case, Davis sought to admit a letter from one of the State's non-testifying
witnesses, Terry Riggs, which was written to Davis. Id. at 309. The letter stated, "I told
the DA . . . that I did it all and you didn't have anything to do with it." Id. Davis sought
to offer this letter under Rule 806 as a prior inconsistent statement to impeach other
incriminating statements made by Riggs that were admitted under a hearsay exception. Id.
at 309-10. The Corpus Christi Court held that the letter was hearsay evidence of an out-of-court statement and was, therefore, incompetent evidence to show the existence of a
prior inconsistent statement. Id. This was a correct observation because the letter was
evidence showing that Riggs told Davis that he [Riggs] told the District Attorney that
Davis was innocent. Id. The letter was obviously not competent evidence that Riggs
indeed told the District Attorney of Davis' innocence as such evidence, to be competent
under Rule 806, would have had to come from the District Attorney him/herself testifying
as a witness or from the actual written communication from Riggs to the District Attorney. 
Davis involved what is recognized as "hearsay upon hearsay," an out-of-court statement
[the letter from Riggs to Davis] to prove the matter asserted in another out-of-court
statement [Riggs statement to the District Attorney that Davis was innocent]. (2) In the
instant case, we have only "first-hand" hearsay - - Carlin's out-of-court statements to the
testifying witness, Amy Pinkerton. The trial court erred in refusing to permit Amy
Pinkerton's testimony of Carlin's statements to her. Appellant's issue five is sustained.

 Having found error in the trial court's ruling we must determine whether said error
affected appellant's substantial rights. Tex. R. App. P. 44.2(b). In Johnson v. State, 43
S.W.3d 1, 5 (Tex. Crim. App. 2001), the Court held that it is the responsibility of the
appellate court to assess harm after reviewing the record and that the burden to
demonstrate whether the appellant was harmed by a trial court error does not rest on the
appellant or the State. In cases analyzed under Rule 44.2(b), the appropriate standard of
review is to disregard the error unless a substantial right has been affected. A recent case
by the Court of Criminal Appeals frames the analysis thusly:

 For claims of non-constitutional error, we, like the Supreme Court, hold
that a "conviction should not be overturned unless, after examining the
record as a whole, a court concludes that an error may have had 'substantial
influence' on the outcome of the proceeding." Put another way, if the
reviewing court has "a grave doubt" that the result was free from the
substantial influence of the error, then it must treat the error as if it did. 
"Grave doubt" means that "in the judge's mind, the matter is so evenly
balanced that he feels himself in virtual equipoise as to the harmlessness of
the error." Thus, "in cases of grave doubt as to harmlessness the petitioner
must win." 


Burnett v. State, No. 860-01, 2002 WL 31424314, at *3 (Tex. Crim. App. Oct. 30, 2002).
(footnotes omitted). 

 While we agree with the concept that constitutional error is not always committed
when the trial court erroneously excludes defensive evidence, see Miller v. State, 42
S.W.3d 343, 346 (Tex. App.--Austin 2001, no pet.), we find the following observations
from the Court of Criminal Appeals immensely instructive as to the effects of the trial
court's errors in the instant case on appellant's substantial rights:

 The U.S. Constitution ensures that criminal defendants will have "a
meaningful opportunity to present a complete defense." Gilmore v. Taylor,
508 U.S. 333, 343, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993); Crane v.
Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); California
v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). The
Supreme Court described the different ways a defendant can avail himself of
this opportunity in Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18
L.Ed.2d 1019 (1967):


 The right to offer the testimony of witnesses, and to compel
their attendance if necessary, is in plain terms the right to
present a defense, the right to present the defendant's version
of the facts as well as the prosecution's to the jury so it may
decide where the truth lies. Just as an accused has the right to
confront the prosecution's witnesses for the purpose of
challenging their testimony, he has the right to present his own
witnesses to establish a defense. This right is a fundamental
element of due process of law.


 Id. at 19, 87 S.Ct. 1920. This principle has been invoked in cases where
trial courts have intimidated defense witnesses into silence, see e.g., Webb
v. Texas, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), and where
trial courts have excluded evidence. See Crane v. Kentucky, 476 U.S. at
693, 106 S.Ct. 2142; Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct.
1038, 35 L.Ed.2d 297 (1973).


 In Chambers, the trial court applied the hearsay rule to bar the admission
of evidence by the defendant in support of his defense that another man,
McDonald, admitted that he committed the crimes. 410 U.S. at 287, 93
S.Ct. 1038. The Court reversed the decision of the trial court, explaining
that "the right of an accused to due process is, in essence, the right to a fair
opportunity to defend against state accusations. [The right] to call witnesses
in one's own behalf [has] long been recognized as essential to due process." 
Id. at 294, 93 S.Ct. 1038. Furthermore, Justice Black has described as a
critical component of our criminal justice system:


 A person's right to reasonable notice of a charge against him,
and an opportunity to be heard in his own defense - - a right to
his day in court - - are basic in our system of jurisprudence,
and these rights include, as a minimum, a right to examine the
witnesses against him, to offer testimony, and to be
represented by counsel.


 In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948).[ (3)]


Miller v. State, 36 S.W.3d 503, 506 (Tex. Crim. App. 2001). 

 After examining the entire record before us we simply cannot conclude that the
errors by the trial court did not have "substantial influence" on the outcome of the trial. 
In other words, we do indeed have "grave doubt" that the result of the trial was free from
the substantial influence of the error. To have erroneously permitted the State to elicit the
testimony of Carlin's hearsay statements to Trooper Fountain incriminating appellant was
harmful enough in a case where the only truly contested issue was which man was
operating the performance boat. But the trial court compounded the harm when it refused
to permit appellant from presenting evidence that, if believed by the jury, would have
exonerated him. After all, under the facts of the instant case, there could be only one
operator of the boat that struck the cabin cruiser. No theory of parties was presented to
the jury by the State. We echo the closing sentiments of the Austin Court in their harmless
error review in Miller in that we intimate no opinion as to the credibility of appellant's
defense; we simply decide only that, on this record, appellant was harmed when the jury
was not given the opportunity to hear testimony relevant to appellant's defense and assess
its credibility along with the other evidence in the case. Miller, 42 S.W.3d at 347. We
find appellant's substantial rights were affected by the trial court's errors. We, therefore,
reverse the judgment of the trial court and remand the cause for further proceedings
consistent with this opinion. 

 REVERSED AND REMANDED. 



 PER CURIAM



Submitted on October 3, 2002

Opinion Delivered December 18, 2002

Do Not Publish 


Before Walker, C.J., Burgess and Gaultney, JJ.
1. An examination of the testimony provides several reasons for this: (1) the relatively
poor lighting conditions on the lake that night, (2) the somewhat similar dress and
appearance of appellant and Carlin that evening, and (3) the location of appellant and
Carlin immediately following impact, their respective injuries, and the somewhat chaotic
scene contributing to presumptions, albeit rebutted through vigorous cross-examination,
that either man could have been operating the performance boat at the time of the collision. 

2. Apparently, at least one of the out-of-court statements in Davis was not otherwise
admissible as an exception or exclusion under the hearsay rules. See Tex. R. Evid. 805.
3. The Court includes the following footnote here: "This Court has stated that a
defendant has a Sixth Amendment right to present a defense and to present his version of
the facts. See Coleman v. State, 966 S.W.2d 525, 527-28 (Tex. Crim. App.
1998)(recognizing the defendant's right to compulsory process in order to obtain the
attendance and testimony of witnesses favorable to his defense)(op. on rehearing); Norman
v. State, 588 S.W.2d 340, 343 (Tex. Crim. App. 1979)(concluding that the trial court
committed constitutional error by not granting the defendant's request for immunity for a
state informant in order to compel the informant's testimony in support of his defense.)."