Criminal Case Template














COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS










Ex parte: RAYMOND TAYLOR
,


 Applicant

§



§


§


§


§

No. 08-01-00252-CR


Appeal from the


171st District Court


of El Paso County, Texas


(TC# 20010D02010)




MEMORANDUM OPINION


 This is an appeal from the trial court's order denying Appellant's writ of habeas
corpus. We affirm. 

I. SUMMARY OF THE EVIDENCE


 Applicant was previously convicted for three counts of attempted capital murder. In
that trial, the State presented evidence that Applicant and his wife divorced in 1989. They
were both named managing conservators of their two children. Applicants ex-wife, Josefina,
married John Garmon and they had a son. On May 3, 1996, Applicant's children Jackie, age
eleven, and Christopher, age ten, set the house of their mother and stepfather on fire. The
three suffered injuries but survived the fire. During this trial, the State presented evidence
in support of its theory that Applicant had utilized physical and psychological intimidation
to goad the children into setting the fire. On appeal, this Court reversed the conviction based
upon a then recent holding of the Court of Criminal Appeals which changed the law
regarding the necessity to corroborate the accomplice witness testimony of juvenile
witnesses. The Court of Criminal Appeals affirmed the holding of this Court. 

 The retrial of the case began in April of 2001. Both Christopher Taylor and Jackie
Taylor testified. Christopher, age ten at the time of the offense, testified that Applicant told
him to set the fire and gave him instructions as to how to proceed. Christopher was given
a watch with its alarm set at two a.m. He and his sister were to arise and pile clothes and
sheets in front of each bedroom door. Christopher was shown how to cut the wires on the
smoke alarm. He was to turn on the gas on the stove and the fireplace. He was to start the
fire with a lighter provided by Applicant. Applicant told Christopher to leave the garage
open one foot and they were to escape through that opening. The child failed to start the fire
on the first two occasions demanded by Applicant. Applicant went to his garage with
Christopher and spanked him with his pants down. He then read Bible verses to the child. 
 On the date of the fire, Jackie woke up Christopher. He cut the wires on the smoke
detector. They both piled up clothes and sheets in front of the doors of each bedroom and
closed the doors so the Garmons and their son would not awake. They started a fire in front
of the Garmons bedroom door and fled through the garage door. Christopher testified that
he knew that the occupants might not be able to escape and they could be killed. He stated
that he set the fire because he was told to do so by Applicant and he feared another spanking
by Applicant if he did not comply with his wishes. 

 Jackie Taylor testified that she was eleven-years-old at the time of the offense. She
testified that she and her brother set the fire because they were told to do so by Applicant
because he wanted the fire to kill his ex-wife. He gave Jackie a lighter and a watch with the
alarm set for 2:40 a.m. She was instructed that when the alarm went off, she was to wake
Christopher and he would cut the wires on the smoke detector. They were to pile clothes in
front of the bedroom doors, close them, and turn on the gas. Jackie testified that Applicant
threatened them with severe spankings if they did not set the fire. 

 The alarm went off and Jackie woke up Christopher. They piled up clothes in front
of the bedroom doors and closed the doors. Jackie gave Christopher the lighter and he lit
three fires. She had raised up the garage door previously and they left by going under the
garage door. Upon cross-examination, Jackie testified concerning a confrontation she had
with her father after the fire. He wanted to know why she had lied to a psychologist, Dr.
Gold, that he was involved with the fire. 

 During the course of the trial, the State, outside the presence of the jury, proposed to
offer the testimony of Dr. Karen Gold concerning Christopher's statements to her when she
informed him that Applicant had been arrested. A hearing was held and Dr. Gold stated that
she had performed evaluations of the children during the summer of 1996. Christopher had
related to Dr. Gold why he had set the fire. During one session, she told Christopher that his
father had been arrested. His version of the events then changed. The following exchange
then occurred:

 STATE: How did [Christopher] react when he was told that?

 WITNESS: He became very upset. There was an initial shock. And then his
demeanor changed and his physical behavior changed. He
hurled himself at me physically.


 STATE: And was he - obviously, he was upset, crying?


 WITNESS: Yes.


 STATE: What else?


 WITNESS: He immediately opened up and started disclosing information to
me that, up to that point, he had not said anything about.


 STATE: Okay. Did he give you a version of the fire, of why he set the
fire after you told-after he was told that his father was put in
jail?


 WITNESS: Yes.


 STATE: Was that different from the version that he was giving before he
was-before he was told about his father's incarceration?


 WITNESS: Yes. 


 In response to the prosecutor's question about what Christopher told her about the fire
after she told him about his father's incarceration, Dr. Gold responded:

 WITNESS: The first thing that he did was ask me a question, which was,
'Does that mean I don't have to keep the secret anymore?' And
I asked him, 'What secret?' And he proceeded to tell me that it
was his-under his father's instructions that he had set the fire,
which he had denied prior to that triggering event. 


 Over the course of the hearing, the prosecutor proposed that the child's statement was
admissible under the excited utterance exception to the hearsay rule. Initially, the court held
that the testimony was not admissible. However, after the weekend recess, the court
announced that Dr. Gold's testimony would be allowed as an excited utterance. She testified
before the jury that the Child Protective Services case worker for Christopher asked that Gold
reveal to him that his father had been arrested. She related Christopher's reaction during the
following exchange:

 STATE: And what did you tell Christopher Taylor in regards to his
father?


 WITNESS: The relevant discussion began with my saying to him: Chris, I
have something to tell you because we don't want you to find
out from TV or somebody else.


 STATE: And did Christopher ever have a response to that?


 WITNESS: Yes. I saw a startled reaction, and he said, 'What's happened?'


 STATE: And what did you tell Christopher at that point?


 WITNESS: I said, 'Well, Chris, our daddy is in jail.'


 STATE: How did he -- what was his physical reaction to that?


 WITNESS: Well, he gasped. His eyes got really big. He began crying and
shaking, and, for the first time in our relationship, he made
physical contact with me. He literally hurled himself at me,
threw himself into my arms and wanted me to hold him. At
least that's what I gathered from him throwing himself into my
arms.

 STATE: How was this -- how was this compared to your earlier
interactions with Christopher?

 WITNESS: This was a very, very emotional display compared to anything
else that I had seen from Christopher up to that point.


 STATE: How long did this display take place?


 WITNESS: He calmed down just a little bit. He regained some composure,
and we were able to have some dialogue. We were together for
about 35 minutes.


 STATE: Okay, what was the next thing that was said?


 WITNESS: Okay. He asked, 'For how long?' And my answer was, 'I don't
know.' And then he said, 'Why?' And then I responded, 'The
police think that they have figured things out and they think your
dad might have taught you and Jackie what to do to get a fire to
start.' And shall I go on?


 STATE: What was his response to that?


 WITNESS: He said, 'But I tried so hard to keep it a secret. I tried for a
whole month, but Jackie couldn't keep it inside anymore and she
told, but I didn't tell. She told.'


 STATE: Had Jackie already discussed the Defendant's involvement by
this point?


 WITNESS: I believe she had, yes. I asked him, 'Told what?' And he
responded, 'That my dad told us what to do.' I said, 'What do
you mean?' I asked him. And he said. 'My dad showed us and
told us what to do.' 


 Applicant then objected that this was not the excited utterance that was outlined in the
voir dire hearing. Outside the presence of the jury, the court expressed concern that the
conversation lasted as long as four minutes. The prosecutor stated that the excited utterance
exception was met in that the child was still under the excitement of the event which caused
the excitement. The State was allowed to develop more testimony from Dr. Gold. She stated
that the exchange that she testified to before the jury lasted at most thirty seconds. She stated
that during this time, the child was crying, sobbing, shaking, clutching her and squeezing her
around the shoulders and neck. He was hysterical and there were no gaps in time. Dr. Gold
also testified that Christopher also went on to say that he tried to keep his father's
involvement a secret as opposed to his sister. He was highly emotional during this discourse
and it was of short duration. Christopher expressed feelings of guilt regarding his father's
incarceration. After the child calmed down, they then went on to discuss other matters
during the remainder of the session. Gold stated that the interlude when these statements
were made lasted not more than two minutes and occurred in a rapid-fire manner. The court
expressed concern that there was conflicting testimony regarding the issue of whether
Christopher had calmed down while giving the statements and the statements were given
during a dialogue instead of blurted-out statements. 

 Applicant requested a mistrial maintaining that an instruction to disregard would be
ineffectual. The court granted the motion for mistrial. 

 Applicant filed a writ of habeas corpus alleging a double jeopardy violation. On June
15, 2001, a hearing was held on Applicant's writ of habeas corpus before the same judge that
presided during the second trial. Applicant called William Ellis, Dr. Gold's counsel, to
testify. Based upon Dr. Gold's initial voir dire testimony concerning Christopher's
statements, he became aware that Dr. Gold's interview notes of her conversations with the
child were different from her testimony. He mentioned this divergence to the prosecutor and
he thought that he told the prosecutors that they should inform the court. Ellis intended to
inform the court but he did not advise the court because he was in another hearing when Dr.
Gold testified before the jury. 

 The State called John Gibson, one of the prosecutors at trial, to the stand. Gibson
testified that before Dr. Gold's testimony before the jury, Ellis spoke with him and told him
that Dr. Gold had reviewed her notes and there were differences with regard to her testimony
during the voir dire examination. Gibson testified that he spoke with Gold and determined
that there were two minor variances concerning phrasing. He stated that he made sure that
in spite of these variances, that Christopher was in the stress of the event when he made his
statements. Gibson testified that he did not want a mistrial and that he had not intentionally
or recklessly caused the mistrial. He stated that he had given much thought to the question
of the excited utterances and he felt that the testimony was admissible. Gibson stated that
he remembered the conversation with Ellis that the testimony might be different but he did
not recall that Ellis advised him to inform the trial judge. 

 Lori Swopes, the other prosecutor in the case, was then called to the stand. Swopes
remembered Ellis approaching her and expressing concern about Gold's testimony. She
stated that she spoke to Dr. Gold prior to her testimony before the jury. Swopes testified that
she noticed a phrase in Gold's notes that Christopher had regained some composure and
began talking. Dr. Gold responded that he regained enough composure to talk but he was
still very excited and very emotional. Based upon her conversations with Dr. Gold, she felt
that Gold's testimony would be within the parameters of the court's ruling. She stated that
she did not desire a mistrial and she did not feel that she acted intentionally or recklessly in
bringing about a mistrial. The court overruled Applicant's request for habeas corpus relief. 

II. DISCUSSION


 In three issues, Applicant asserts that the court erred in denying Applicant habeas
corpus relief because the prosecutors consciously disregarded a substantial and unjustifiable
risk that a mistrial would be granted on motion of Applicant during the trial. (1) When
conducting an appellate review, an appellate court must determine the amount of deference
given to the ruling at issue. Appellate courts either give almost total deference to trial court
rulings, or review the rulings de novo, dependant on the basis of the decision being
challenged. Where, as here a reporter's record of the hearing on the application for writ of
habeas corpus is presented, almost total deference is given to the (1) trial court's
determinations of historical facts with support in the record, (2) fact determinations which
involve an evaluation of credibility or demeanor, and (3) rulings on those questions involving
application of law to fact (also known as mixed questions of law and fact) if the resolution
of those ultimate questions depends upon an evaluation of credibility and demeanor. 
Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (en banc); Hill v. State, 79
S.W.3d 682, 686 (Tex. App.--Amarillo 2002, pet. ref'd). This level of appellate deference
is referred to as a review for abuse of discretion. Guzman, 955 S.W.2d at 89; Hill, 79 S.W.3d
at 686. Mixed questions of law and fact not falling within the foregoing categories may be
reviewed de novo by the appellate court. Guzman, 955 S.W.2d at 89; Hill, 79 S.W.3d at 686. De
novo review does not embody the abuse of discretion standard of review. Guzman, 955
S.W.2d at 89; Hill, 79 S.W.3d at 686. Even when the reviewing court is conducting a de
novo review, however, an appellate court gives appropriate deference (abuse of discretion)
to the trial court's findings on subsidiary factual questions. Guzman, 955 S.W.2d at 89; Hill,
79 S.W.3d at 686. 

 The long-established general rule in Texas is that a mistrial granted at the defendant's
request poses no double jeopardy limitation upon a re-trial of the defendant. See Bauder v.
State, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996) (Bauder I). Thus, "ordinarily, when a
defendant obtains a mistrial at his own request, a second trial is not jeopardy barred because
the defendant's motion for mistrial is considered 'a deliberate election on his part to forego
his valued right to have his guilt or innocence determined before the first trier of fact.'" Id. 
However, the Court of Criminal Appeals has recognized an exception to this general rule,
holding that a subsequent prosecution will be jeopardy barred after declaration of a mistrial
at the defendant's request, not only when the objectionable conduct of the prosecutor was
intended to induce a motion for mistrial, but also when the prosecutor was aware but
consciously disregarded the risk that an objectionable event for which he was responsible
would require a mistrial at the defendant's request. Id. at 699. This rule is invoked only
where the mistrial is unavoidable, a very unusual circumstance given the presumption that
curative instructions are effective in removing questionable argument and evidence from the
consideration of the jury. Id. at 699-700. The Court of Criminal Appeals has recently further
clarified this standard, noting that two critical questions must be answered: on the one hand,
whether the Appellant's motion for mistrial was a choice he made in response to ordinary
reversible error in order to avoid conviction, appeal, reversal, and retrial. Or, on the other
hand, was he required to move for mistrial because the prosecutor deliberately or recklessly
crossed "the line between legitimate adversarial gamesmanship and manifestly improper
methods" . . . that rendered trial before a jury unfair to such a degree that no judicial
admonishment could have cured it? See State v. Lee, 15 S.W.3d 921, 923 (Tex. Crim. App.
2000) (quoting Ex parte Bauder, 974 S.W.2d 729, 732 (Tex. Crim. App. 1998)(Bauder II )). 
 This standard imports a mens rea requirement into the double jeopardy context. When
the prosecutor's conduct is either intentional or reckless as described above, subsequent
prosecutions are barred by the double jeopardy protection. Bauder, 921 S.W.2d at 699. 
Thus, in order for a prosecutor's offer of evidence to be viewed as an intentional or reckless
act within this context, he must have either (1) "believe[d the evidence would] materially
improve his chances of obtaining a conviction, and the law considers the prejudicial effect
of such objectionable evidence to be incurable even by a firm judicial admonishment to the
jury [;]" or (2) been "aware but consciously disregarded the risk that an objectionable event
for which he was responsible would require a mistrial at the defendant's request" or have
been aware but consciously disregarded the risk that a mistrial would be "reasonably certain"
to occur as a result of his conduct. Lee, 15 S.W.3d at 925. In determining whether the
prosecutor acted intentionally or recklessly, the reviewing court must take into account the
appropriate substantive law. Id. at 924. 

 We first address the question if a mistrial was unnecessary due to the fact an
instruction to disregard would have cured any error that occurred. Improper evidentiary
rulings are generally cured by an instruction to disregard. Lee, 15 S.W.3d at 926 n.8. In this
instance there was abundant testimony before the jury from the two children that Applicant
had manipulated the children into setting the fire. Further, the general subject of the children
relating Appellant's involvement to Dr. Gold was brought out by Applicant during the cross-examination of Jackie Taylor. The improper admission of hearsay testimony can be rendered
harmless when an instruction to disregard is administered and other similar evidence is
properly before the factfinder. See Brockway v. State, 853 S.W.2d 174, 177-78 (Tex. App.--Corpus Christi 1993, pet. ref'd). In this case, we find that an instruction to disregard would
have cured any error. This has the effect of producing "ordinary reversible error," which
does not bar retrial. See Bauder v. State, 974 S.W.2d 729, 732 (Tex. Crim. App. 1998).

 Further, the reviewing court must take into account the appropriate substantive law
in assessing the prosecutor's mental state. Lee, 15 S.W.3d at 924. The appellate court in
reviewing claims of this nature, must examine the prosecutor's intent from the evidence at
the hearings and compare that with the substantive law. If the evidence that was the subject
of the mistrial is not clearly erroneous under substantive law, then there is neither intent nor
reckless disregard that a mistrial was reasonably certain to occur. Id. at 924-26. 

 In Salazar v. State, 38 S.W.3d 141 (Tex. Crim. App. 2001), the Court of Criminal
Appeals held that an excited utterance may be made in response to a question or it may be
separated in time from the startling event as long as the declarant is still dominated by the 
emotions, excitement, fear, or pain of the event at the time of the statement. Id. at 154. In
this case, the testimony revealed that the startling event, telling Christopher that his father
had been arrested, caused the child to hold on to Dr. Gold and begin sobbing. While he
calmed down enough to answer several short questions, there was only a two minute period
when the child related Applicant's culpability, and, during this time he was crying and
clutching Dr. Gold. We find that the prosecutor's decision to go on with Dr. Gold's
testimony before the jury was not clearly erroneous and retrial is not barred. We overruled
issues one through three.




 Having overruled each of Applicant's issues on review, we affirm the order of the trial
court.

July 31, 2003


 RICHARD BARAJAS, Chief Justice



Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.


(Do Not Publish)
1. In Issues Nos. Two and Three, Applicant requests a factual and legal sufficiency review as to whether the
evidence established by the overwhelming weight and preponderance and as a matter of law that the State
consciously disregarded a substantial and unjustifiable risk that a mistrial would be granted on motion of Applicant
during trial. Applicant cites no authority authorizing this type of sufficiency review with regard to writs of habeas
corpus. With regard to the standard of review on motions to suppress evidence, a legal sufficiency review has been
disallowed as such issues went to the admissibility of the evidence and were not an element of the offense charged. 
Malik v. State, 953 S.W.2d 234 (Tex. Crim. App. 1997); Johnson v. State, 95 S.W.3d 568, 572 (Tex. App.--Houston [1st Dist.] 2002, pet. ref'd). Further, given the unavailability of a legal sufficiency review, it has been held
that as a factual sufficiency analysis presumes that the evidence has already been found legally sufficient, it follows
logically that there can be no factual sufficiency review of suppression issues. Johnson, 95 S.W.3d at 573. We find
that this reasoning follows in the instant case and we decline to utilize the requested legal and factual sufficiency
review.