NO. 07-02-0410-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

JUNE 3, 2004

_____

GARRETT WILLIAM FIFE,

Appellant

v.

THE STATE OF TEXAS,

Appellee

_____

FROM THE 284TH DISTRICT COURT OF MONTGOMERY COUNTY;

NO. 01-11-06856-CR; HON. P. K. REITER, PRESIDING

_____

*Memorandum Opinion*

_____

Before JOHNSON. C.J., and QUINN and CAMPBELL, JJ.

Garrett William Fife (appellant) appeals his conviction for possession of a controlled substance over 400 grams. Via seven issues, he contends that 1) the evidence was insufficient to support his conviction, 2) his counsel was ineffective and 3) the trial court erred in denying his motion for a new trial based on jury misconduct. For the following reasons, we affirm.

## Background

Officer Cole Lester with the Houston Police Department testified that he was involved in a narcotics investigation in Montgomery County, Texas. Deputy Cash with the Montgomery Sheriff's department assisted in the investigation. Initially, the investigation concerned a man named Roy Rogers, and Lester set up surveillance on Rogers' house. During that time, Lester observed "vehicles coming in and out and departing" which based on his "years of experience" was a "pattern for narcotics traffickers." Subsequently, Lester and Cash approached the house to determine if they could obtain a consent to search, which consent they received. While in the residence, they found "[m]ethamphetamine paraphernalia and some actual substance and several containers, beakers, things that are utilized in the production and manufacturing of methamphetamine."

During the de-briefing of Rogers, the officers learned appellant's name and that "there were narcotics paraphernalia and/or substance. . ." at his residence. The officers, along with two others, arrived at appellant's residence about 6:30 p.m. and knocked on the door. Appellant's father answered the door and consented to a search of the house.

Appellant was found sleeping in a bedroom, but the officers awakened him. Furthermore, Lester observed next to the bed a plate with white residue and two hypodermic needles. The items were then seized. Appellant then stated, "[w]hatever is here, it's mine. It's not my brother's, it's not my dad's, it's mine." Permission was also given to search the garage wherein some materials were found that traditionally were used in a methamphetamine laboratory.

During a suppression hearing, appellant's father testified that he kept the garage door closed, that he did not give permission for the police to go into his house and get his

2

son, that the police began searching appellant and his room and asked his father to leave the room. He further testified that after they had searched appellant's room the officers asked him (appellant's father) to sign a consent to search form. They purportedly intimated that if he did not sign, he would be arrested.

Sheriff's deputy Cash testified that he was "certified by the U.S. Justice Department as a clandestine lab investigator and a site safety officer." He testified that there were "numerous methods" to manufacture methamphetamine such as the "Nazi method and the red phosphorus, or Mexican National style." He also explained that by mixing red phosphorus, iodine crystals and ephedrine (found in Sudafed) in a high-pressure flask or a device that will hold pressure, it will have an exothermic reaction or the chemicals will react very violently, and the composition of the ephedrine will change into methamphetamine. Furthermore, the most common container used is "the single-neck Erlenmeyer flask." However, "wine bottles, Coke-Cola [sic] bottles, whiskey bottles, anything that will hold pressure" could be used, he continued.

While observing the garage, Cash purportedly saw a Coca-Cola bottle on the shelf with an amber colored liquid in it. Also found were jars on the shelf with liquid in them, "a box on the floor that ha[d] a Coca-Cola bottle with a hose taped to it sticking out," a "rolled up 3/4 inch or 1 inch reinforced plastic hose," "some solvents and paint cans," and muriatic acid. Cash stated that any time you are dealing with a clandestine meth lab many of these were the items one looks for. And, as for the muriatic acid, it was "used to level out the pH and is found in every drug lab," according to Cash.

In addition to describing the items discovered on the premises, Cash also testified about his interaction with appellant and his father. Appellant was purportedly advised that

3

the officers were conducting a narcotics investigation and that they had received verbal consent to search the house from appellant's father prior to entering the house and written consent thereafter. Appellant's father allegedly told Cash that if there were any drugs in there that he wanted them out of his house.

Cash also testified about how he entered the bedroom where appellant was sleeping and noticed the Pyrex plate beside the bed. It contained white powder and two hypodermic needles. In his closet were found over a dozen empty Sudafed boxes which drug contained ephedrine.

Upon cross-examination, Cash stated that the officers "couldn't make a determination at that point when the cook took place." Yet, the waste still contained a percentage of methamphetamine, said Cash.

Ricky Duane Viser (Viser) testified for the State regarding the content of the gallon jug labelled muriatic acid. After being tested extensively, it was found to contain methamphetamine. Furthermore, he testified that the total weight of the liquid containing methamphetamine was in excess of 400 grams.

Appellant called his own expert, Dr. Andrew Armstrong. The latter said that he had tested the contents of the gallon jug and found that while there was some methamphetamine present, it did not exceed 400 grams but rather constituted a trace. Appellant also called his mother and father as witnesses. Mr. Fife testified that 1) the items found in the garage were used in air conditioner repair and maintenance, 2) the muriatic acid was used to clean the concrete driveway, and 3) his consent to search was involuntary. In turn, appellant's mother testified that they collected items for recycling, *i.e.* glass, plastic and tin and some of the items found in the garage came from that effort.

4

The jury found appellant guilty of possession of methamphetamine in excess of 400 grams. The court assessed punishment at 25 years in prison. Appellant filed a timely motion for new trial, and a hearing was held on same. After the trial court denied appellant's motion, appellant filed his notice of appeal.

### Issue One - Insufficient Evidence

In his first issue, appellant contends that the evidence was insufficient to support his conviction for possession of methamphetamine because "the State relied on prejudicial and non-relevant evidence to convict" him. We overrule the issue.

The standards by which we review the legal and factual sufficiency of the evidence are well explained in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), *Sims v. State*, 99 S.W.3d 600 (Tex. Crim. App. 2003), *Zuliani v. State*, 97 S.W.3d 589 (Tex. Crim. App. 2003), and *King v. State*, 29 S.W.3d 556 (Tex. Crim. App. 2000). We refer the parties to those opinions.

Next, possession of a controlled substance in penalty group 1 is established by evidence that 1) a person 2) knowingly or intentionally 3) possessed 4) a controlled substance. TEX. HEALTH & SAFETY CODE ANN. §481.115(a) (Vernon 2003). The offense is one punishable by imprisonment for life or for a term not more than 99 years or less than ten years if the amount possessed is, by aggregate weight, including adulterants or dilutants, 400 grams or more. *Id.* at (f).

The evidence of record showed that 1) officers searched appellant's residence based on information they received from a prior search and arrest, 2) they found a gallon jug marked muriatic acid which tested positive for methamphetamine, 3) the State's expert witness testified that the amount of methamphetamine exceeded 400 grams, and 4)

5

appellant admitted that any drugs found belonged to him and that neither his father or brother had anything to do with it. And, though other evidence illustrated that the amount possessed was less than 400 grams, this is some evidence upon which a rationale jury could find, beyond reasonable doubt, that appellant possessed a controlled substance in excess of 400 grams, when the weight of the dilutants and adulterants was considered as per statute.

As for the supposedly prejudicial and non-relevant evidence mentioned in his issue, it allegedly included items seized at his residence that could be used for the manufacture of drugs. And, because he was not charged with that offense, they allegedly were irrelevant. We disagree for the State was obligated to show that appellant had knowledge that what he possessed was indeed a controlled substance. Having paraphernalia used to make a particular product is some evidence from which one could reasonably infer that the possessor knew about the nature of the substance made with the paraphernalia, or at least a trial court could have concluded such in the exercise of its discretion. *See e.g., Gant v. State,* 116 S.W.3d 124, 131 (Tex. App.--Tyler 2003, pet. ref'd) (noting the presence of drug paraphernalia as a link connecting the appellant to the drug). In short, the decision to admit the evidence did not fall outside the zone of reasonable disagreement. Nor did the evidence somehow divest the verdict of evidentiary support.

### Issue Two - Insufficient to Show Amount of Drug Possessed

In his second issue, appellant contends that the State failed to prove that muriatic acid was a dilutant of methamphetamine and, therefore, it failed to prove he possessed an amount in excess of 400 grams. We disagree.

6

As the State pointed out, appellant relies on arguments and authority in existence prior to the change in the definition of a controlled substance. *See Isassi v. State,* 91 S.W.3d 807, 810 (Tex. App.--El Paso 2002, pet. ref'd). Now, "adulterant or dilutant" is defined to mean "any material that increases the bulk or quantity of a controlled substance, regardless of its effect on the chemical activity of the controlled substance." *See* TEX. HEALTH & SAFETY CODE ANN. § 481.002(49) (Vernon 2002). Furthermore, the State has to prove only that the aggregate weight of the mixture, including adulterants and dilutants, equaled the minimum weight alleged in the charged offense. *See Hines v. State*, 976 S.W.2d 912, 913 (Tex. App.--Beaumont 1998, no pet.). And, because the evidence before us showed that the State proved exactly what it alleged in the indictment (*i.e.* that appellant possessed over 400 grams of methamphetamine, including adulterants or dilutants), we again conclude that the evidence was sufficient to support appellant's conviction for possessing more than 400 grams of methamphetamine.

### *Issue Five - Motion for New Trial based on Jury Misconduct*

Appellant contends, in his fifth issue, that the trial court erred in denying his motion for new trial based on juror misconduct. The issue involved the conduct of Clifford Danny O'Connor, an individual who had received special training in air conditioning repair from the Lincoln Technical Institute. According to appellant, O'Connor informed the other jurors, during deliberation, that "[t]he plastic bottle with the hose coming out of it wouldn't work to clean out drain lines." Such a theory was proffered by appellant as an explanation as to why it was present at the house. Instead, according to "O'Connor, "[t]o clean out the line you would have to blow out the line with pressure, like a compressor or a [sic] air bottle, or

7

tank." So informing his colleagues purportedly arose to the level of juror misconduct and warranted reversal. We overrule the issue.

No evidence of record illustrates that O'Connor told the jury of the information in question. Such appears neither in his affidavit nor the testimony elicited at the hearing on the motion for new trial. There being no evidence to support appellant's contention, the trial court did not abuse its discretion in overruling the motion for new trial. *See Salazar v. State,* 38 S.W.3d 141, 148 (Tex. Crim. App. 2001) (holding that whether a trial court erred in denying a motion for new trial depends upon whether it abused its discretion).

### *Issues Three, Four, Six and Seven - Ineffective Assistance of Counsel*

In issues three, four, six and seven, appellant contends that trial counsel was ineffective because he 1) allowed "non-relevant and prejudicial evidence to be admitted," 2) failed to request a lesser-included offense in the jury charge, 3) failed to elicit pertinent information from the venire during voir dire about the work experience of its members, and 4) failed to attack the element of possession. We overrule the issues.

The standard by which we review claims such as these is well established. Therefore, it will not be repeated. Instead, we cite the parties to *Strickland v. Washington*, 466 U.S. 668, 687-95, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *Bone v. State*, 77 S.W.3d 828 (Tex. Crim. App. 2002) and *Tong v. State*, 25 S.W.3d 707 (Tex. Crim. App. 2000), for explanation of same. Furthermore, claims of ineffective assistance must be firmly founded in the record. *Rios v. State*, 990 S.W.2d 382, 385 (Tex. App.--Amarillo 1999, no pet.).[1]

---

[1]A motion for new trial was filed but it was not based on a claim of ineffective assistance of counsel.

8

Nothing of record indicates the reasoning, if any, for counsel 1) withholding objection to the supposedly prejudicial evidence, 2) withholding a request for a lesser-included offense, and 3) purportedly failing to attack the element of possession. And, though appellant moved for a new trial, his effectiveness was not raised in the motion.

As required by the applicable standard of review, we must presume that his conduct was reasonable and professional until the appellant shows otherwise by a preponderance of the evidence. *Bone v. State*, 77 S.W.3d at 833. Seldom can that burden be met through reliance on the trial record. *Id.* Moreover, we can see potential strategy underlying that which is questioned here. For instance, and regarding the supposed prejudicial evidence (which happens to be the same evidence we addressed in the preceding issue), we found it to be both relevant and admissible. Thus, counsel may not have objected to it because he concluded similarly. And, it is clear that counsel need not object to admissible evidence to be effective. *Saenz v. State,* 103 S.W.3d 541, 546 (Tex. App.--San Antonio 2003, pet. ref'd) (holding that the failure to object to admissible evidence is not deficient conduct).

As to the failure to request a lesser-included offense, it has been recognized that such may well be a reasonable trial strategy. *See Wood v. State,* 4 S.W.3d 85, 87 (Tex. App.--Fort Worth 1999, pet. ref'd) (stating that it may be reasonable trial strategy not to request a lesser-included offense). Given the testimony by appellant's own expert that the muriatic acid solution contained less than 400 grams of methamphetamine, counsel may well have thought it best to pursue an all or nothing tactic. And, "[i]t is not uncommon in a case such as this" to do so. *Id.* at 88.

As to the allegation that counsel was ineffective since he failed to attack the element of possession (*i.e.* that he, as opposed to someone else, possessed the container holding

9

the muriatic acid and methamphetamine), appellant's exclamation to the officers that the drugs were his, as opposed to his father's or brother's, may have swayed counsel's trial stratagem. And, such could well have been reasonable under the circumstances.

In short, we are left to guess at why counsel did what he did *viz* the three complaints we mentioned. And given that we cannot say his conduct was bereft of potential stratagem in view of the circumstances (or lack thereof) of record, appellant did not rebut the presumption mandated by the Texas Court of Criminal Appeals in *Tong*, *Bone*, and many other opinions.

As to the fourth allegation of deficient performance, appellant thought that his attorney should have asked the venire, during voir dire, about their work experience. This would have probably led to one juror declaring that he had knowledge about air conditioning repair, suggested appellant. The latter continued by opining that because the juror would have probably so declared and because the topic related to a line of defense being proffered, the juror would probably have been challenged and removed from the pool. And, had the juror been removed, he would not have "offered his 'expert' opinion [about various aspects of air conditioning repair] once the jury retired to deliberate," according to appellant. In other words, appellant argued that his attorney's purportedly deficient conduct harmed him because the juror in question (most likely O'Connor though he was never named) voiced opinions about the legitimacy of a particular defensive theory posed by appellant. Assuming *arguendo* that counsel's action was deficient (something we do not decide), we would nonetheless find the contention meritless. This is so because no evidence appears of record indicating that the juror in question told his fellow jurors about his opinions regarding air conditioner repair and whether appellant's defensive theory had

10

any legitimacy. There being no evidence of that, appellant has not shown that but for the act of his attorney there existed a reasonable probability that the outcome of the trial would have differed. *See Tong v. State*, 25 S.W.3d at 712 (stating that to be the test for harm).

Having overruled each of appellant's issues, we affirm the trial court's judgment.

Brian Quinn
Justice

Do not publish.

11